**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| L. J., a minor, by and through his Guardian ad Litem; NASHIRA HUDSON, an individual, <br> *Plaintiffs-Appellants*, <br><br> v. <br><br> PITTSBURG UNIFIED SCHOOL DISTRICT; LINDA K. RONDEAU, in her official capacity as Superintendent of the Pittsburg Unified School District, <br> *Defendants-Appellees*. | No. 14-16139 <br><br> D.C. No. 3:13-cv-03854-JSC <br><br><br> ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Northern District of California
Jacqueline Scott Corley, Magistrate Judge, Presiding

Argued and Submitted June 16, 2016
San Francisco, California

Filed September 1, 2016
Amended February 27, 2017

Before: Mary M. Schroeder, A. Wallace Tashima,
and John B. Owens, Circuit Judges.

Order;
Opinion by Judge Schroeder

**SUMMARY**[*]

### Individuals with Disabilities Education Act

The panel filed (1) an order amending its opinion and denying a petition for panel rehearing and a petition for rehearing en banc, and (2) an amended opinion reversing the district court's summary judgment in favor of the defendant school district in an action brought by a student and his mother under the Individuals with Disabilities Education Act.

The panel held that the student was eligible for special education and related services. The panel agreed with the district court that the student was disabled under three categories defined by the IDEA. The panel disagreed, however, with the district court's ruling that the student did not need special education services because of his satisfactory performance in general education classes. Rather, the student exhibited a need for services because his improved performance was due to his receipt of special services, including mental health counseling and one-on-one assistance not offered to general education students. In addition, the district court did not adequately take into account the student's continued troubling behavioral and academic issues. The panel held that the student's psychiatric hospitalizations and suicide attempts were relevant to his eligibility for specialized instruction even though they occurred outside of school.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the school district also committed procedural violations of the IDEA by failing to disclose school records and failing to conduct a health assessment.

The panel reversed the district court's decision and remanded for it to order that the school district provide the remedy of an individualized educational plan.

## COUNSEL

Jean Adams (argued), Adams Esq. APC, Oakland, California, for Plaintiffs-Appellants.

Kimberly Smith (argued) and Stephanie S. Baril, Tomsky Fagen Friedman & Fulfrost LLP, Los Angeles, California; David R. Mishook, and Jan E. Tomsky, Tomsky Fagen Friedman & Fulfrost LLP, Oakland, California, for Defendants-Appellees.

## ORDER

The opinion filed September 1, 2016, slip op. 1, and appearing at 835 F.3d 1168 (9th Cir. 2016), is amended. It may not be cited as precedent by or to this court or any district court of the Ninth Circuit. An Amended Opinion is being filed concurrently with this order.

The panel has voted to deny Appellees-Defendants' petition for panel rehearing. Judge Owens has voted to deny the petition for rehearing en banc, and Judges Schroeder and Tashima have so recommended.

The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

Appellees-Defendants' petition for panel rehearing and the petition for rehearing en banc are **DENIED**. Further petitions for rehearing and rehearing en banc shall not be entertained.

## OPINION

SCHROEDER, Circuit Judge:

### INTRODUCTION

This is an Individuals with Disabilities Education Act ("IDEA") case of an emotionally troubled young child with suicidal tendencies beginning in the second grade, and with attention deficit hyperactivity disorder ("ADHD") augmenting his disruptive behaviors. Congress created the IDEA to bring disabled students into the public education system by requiring states to adopt procedures to develop individualized plans for such students. Students with disabilities are entitled to special education services to ensure that they receive a "free and appropriate public education" ("FAPE").

The Pittsburg Unified School District ("School District") determined that L.J. was not entitled to special education services because he was not disabled, and its determination was upheld on administrative review. L.J.'s mother filed this action in federal district court to require the School District to

provide L.J. with an Individualized Education Plan ("IEP") to provide specialized services to assist with what she contends are serious disabilities.

The district court reviewed the record and found that L.J. was disabled under three categories defined by the IDEA. It nevertheless concluded that an IEP for specialized services was not necessary because of L.J.'s satisfactory performance in general education classes. The court discounted L.J.'s suicide attempts as not bearing on the need for educational services because they took place outside of school.

The school records show, however, that beginning in the second grade and continuing into the third and fourth grades, when the parent invoked administrative remedies, the School District had already been providing L.J. with special services, including counseling, one-on-one assistance, and instructional accommodations. These services resulted in L.J.'s materially improved performance. The School District consistently refused, however, to provide him with an IEP that would ensure such services in the future as required by the IDEA. The record also reflects that the School District violated procedural protections of the IDEA by failing to provide the parents with education records bearing on L.J.'s disabilities and services that had been provided. We therefore reverse and remand for consideration of appropriate remedies.

## BACKGROUND

This case presents a bright child's disturbingly troubled history in the primary grades of two through five. L.J. was suspended from school multiple times for disruptive behavior that included kicking and hitting his teachers, throwing rocks, calling teachers and students names, and endangering and

physically injuring classmates. L.J. has attempted to kill himself on at least three occasions and has manifested suicidal ideations prompting the School District's mental health providers to conduct at least one emergency suicide evaluation. L.J. has been diagnosed with three serious disorders, including Bipolar Disorder, Oppositional Defiant Disorder ("ODD"), and ADHD. He has been prescribed a cocktail of serious medications for these conditions.

For years, L.J.'s mother has repeatedly requested, to no avail, that the School District find L.J. eligible for special education. The School District has provided many services to L.J., but has never classified L.J. as eligible for special education under the IDEA. Without such eligibility, L.J. is not guaranteed the services his mother believes that he needs, such as one-on-one educational therapy, counseling services, and behavior intervention services. Instead, the School District has transferred him between at least three different schools.

The history of L.J.'s difficulties began in second grade. During this year, L.J. demonstrated inappropriate behaviors at school, including anger, lack of self-control, and not following rules. After being verbally disciplined by his teacher for bullying other students, L.J. told her that he wanted to die and that life was too hard. School staff called L.J.'s mother, and mental health staff prepared an emergency suicide evaluation. The School District referred L.J. to Lincoln Child Center ("Lincoln"), the School District's counseling center, where mental health providers assessed him. L.J. was diagnosed with ADHD, ODD, and Bipolar Disorder.

L.J. began his third grade year at the same school, but exhibited negative behaviors which the teacher had difficulty controlling. The School District held a student study team ("SST") meeting on September 7, 2011. The purpose of an SST is to develop interventions for students having trouble in school, either academically or behaviorally. In many schools, an SST is the first step in addressing a student's needs before initiating the IEP process.

After L.J.'s SST meeting, the School District's behavior specialist created a behavioral support plan ("BSP") to address his problematic behavior. Over the course of the school year, the behavior specialist revised the BSP multiple times, but L.J. continued to act inappropriately. As a result of the failed BSP, the School District proposed moving L.J. to a segregated trailer at a different school, but with no special education services, with six other African-American boys with extreme behavior problems.

L.J.'s mother disputed the move, retained counsel, and entered mediation. The parties settled by agreeing to place L.J., temporarily, in a different school, in a general education class, conditioned on his having a one-to-one behavioral aide. The School District also agreed to evaluate L.J. for special education.

At the new school, a paraeducator was assigned to work with L.J. one-on-one, and continued to work with him through his third grade year. A paraeducator is a specially trained staff member, assigned to work with special education students. While L.J. progressed academically and behaviorally, he continued to have issues. In April 2012, L.J. wrapped a seatbelt around his neck, and saying he wanted to

die, began rolling around uncontrollably trying to rub his face on the ground. L.J. was taken to the emergency room.

Also, pursuant to the settlement agreement, Dr. Sherry Burke, a school psychologist, conducted psychoeducational and functional analysis assessments of L.J. to assist the IEP team in determining if he qualified for special education under the categories of other health impairment, or specific learning disability. *See* 34 C.F.R. §§ 300.8(c)(9), (10). Dr. Burke reviewed available school records, conducted various interviews of L.J.'s teachers, counselors, and family members, and administered a series of tests. She concluded that L.J. did not meet the eligibility criteria for special education.

On May 29, 2012, L.J. again attempted to kill himself by sticking his finger in a light socket and putting items down his throat. He said that everyone hated him and he did not want to live. He was then confined to a psychiatric hospital, causing him to miss six school days.

The next day, May 30, 2012, while L.J. was hospitalized, the IEP team held a meeting to review L.J.'s assessment results and to make a special education eligibility determination. An IEP team is composed of School District teachers, the parent and other experts familiar with the child. *See* 20 U.S.C. § 1414(d)(1)(B). Dr. Burke presented her findings to the IEP team, including her recommendation that L.J. did not meet eligibility requirements. The IEP team agreed with the psychologist that L.J. had no qualifying disabilities.

The next month, on June 25, 2012, L.J.'s mother formally requested all of L.J.'s school records from the School District,

including any records from Lincoln, where L.J. had received counseling and had been assessed. The School District claimed there were no Lincoln records that had not already been disclosed. L.J.'s mother submitted another request for L.J.'s records on June 28. The School District again failed to disclose any further records.

L.J. was admitted for psychiatric hospitalization on July 17 and again on July 26, when he was detained as a danger to himself or others for banging his head and making threats. Doctors placed L.J. on the psychotropic medications, Adderall, Seroquel, and Wellbutrin, to help stabilize his mood and sustain focus, and later Vistaril to treat his anxiety.

On July 27, 2012, L.J.'s mother filed a request for a due process hearing with the California Office of Administrative Hearings ("OAH"). She claimed that the School District denied L.J. a FAPE by failing to make him eligible for special education and related services, and that the School District had failed to conduct assessments in areas of suspected disability, specifically other health impairment and emotional disturbance. L.J.'s mother also contended that the School District had failed to make requested records available.

The parties again participated in mediation on August 23, 2012. The parties agreed to place L.J. at yet another elementary school, pending the School District's review of L.J.'s psychiatric hospitalization records and Dr. Burke's updating her report. The School District generated a new Assessment Plan for IEP eligibility purposes. L.J.'s mother authorized the release of L.J.'s psychiatric records on the condition that a school nurse would conduct a health assessment and that L.J.'s original third grade teacher would be included in the eligibility process.

For fourth grade, beginning in the fall of 2012, L.J. was in a classroom with a teacher experienced with students with disciplinary problems. L.J. was also provided with special accommodations, including freedom to leave the classroom at will. On September 25, 2012, L.J. was suspended for two days for throwing rocks and threatening to kill the school's principal. The teacher's one-on-one assistance and special accommodations continued throughout the school year, and, as a result, L.J.'s academic performance was satisfactory.

After Dr. Burke updated her assessments, a second IEP team meeting was held on October 9, 2012, to reconsider L.J.'s eligibility for special education services under the category of emotional disturbance. *See* 34 C.F.R. § 300.8(c)(4). The requested third grade teacher was not present at the meeting and L.J. had not been assessed by a nurse, in violation of both conditions insisted upon by L.J.'s mother in the agreement. The team again concluded that L.J. was not eligible for special education, the same conclusion reached at the first meeting the preceding May, despite repeated intervening hospitalizations, heavy medications, renewed suicide attempts, and individualized accommodations in school.

On October 15, 2012, L.J. filed an amended complaint with the California OAH. L.J.'s mother again submitted formal requests for L.J.'s school records in October and November 2012, and in March 2013. The mental health records kept by the School District, including Lincoln, were never disclosed.

During that fourth grade year, L.J. was sent to the office multiple times for physically injuring classmates, disrupting class, and refusing to follow directives. School staff

contacted L.J.'s mother to pick him up from school early on numerous occasions. The School District conducted another mental health assessment. He was again diagnosed with ADHD. In this assessment, the clinician concluded his ADHD symptoms caused clinically significant impairment in L.J.'s social and academic functioning, that L.J. relied extensively on medications, and further, that he evidenced functional impairments in the areas of family relations, school performance, and peer relations.

The following year, in the fall of 2013, the School District nevertheless placed L.J. in a regular fifth grade classroom without accommodations or services. In November, L.J. was rushed to the emergency room by ambulance after attempting to hang himself with a lanyard. That year, L.J. physically injured children and at least one teacher. L.J. was suspended for "kicking and hitting" his science teacher, calling another teacher "stupid," and brandishing a fake knife in the classroom. L.J. was also suspended again because he endangered a classmate by putting expandable pellets in the classmate's water bottle without his knowledge.

That spring, L.J.'s due process request made its way before an Administrative Law Judge ("ALJ"). The ALJ conducted a three-day hearing in April, and on May 23, 2013, the ALJ issued her decision, denying all of L.J.'s requests for relief. The ALJ found that L.J. had no disabilities that would qualify him for special education services, and even if he had qualifying disabilities, he had not demonstrated a need for special services because his academic performance was satisfactory when he was able to attend school.

## PROCEDURAL BACKGROUND

L.J. timely appealed the ALJ's ruling to the district court. L.J. contended that he was eligible for special education services and asked the district court to order the School District to provide an IEP. The parties filed cross-motions for summary judgment. The district court disagreed with the ALJ's decision that L.J. had no disabling conditions. The district court ruled that L.J. met the qualifying criteria as a student with three disabilities: specific learning disability, other health impairment (due to his ADHD), and serious emotional disturbance (due to his ODD and bipolar disorder).

The district court, nevertheless, granted the School District's motion for summary judgment, ruling that L.J. did not need special education services because of his satisfactory performance in general education. The district court adopted the ALJ's findings that L.J. was performing well behaviorally, socially, and academically between May and October 2012 with the help of services the court characterized as general education accommodations, not individualized special education services.

This appeal followed.

## STANDARD OF REVIEW

The district court's findings of fact are reviewed for clear error, even when the district court based those findings on an administrative record, and conclusions of law are reviewed *de novo*. *J.G. v. Douglas Cty. Sch. Dist.*, 552 F.3d 786, 793 (9th Cir. 2008). This court gives "due weight" to ALJ special education decisions. *J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 440–41 (9th Cir. 2010). This standard is far

less deferential than judicial review of other agency actions, but requires this court to refrain from substituting its own notions of educational policy for those of the school authority it reviews. *Amanda J. v. Clark Cty. Sch. Dist.*, 267 F.3d 877, 887–88 (9th Cir. 2001).

## I.   Statutory Background and Legal Framework

Under the IDEA, 20 U.S.C. §§ 1400–1491, all states that receive federal education funding must establish policies and procedures to ensure that a "free appropriate public education is available to all children with disabilities." *Id.* at § 1412(a)(1)(A). The IDEA defines a FAPE as "special education" that is provided at public expense. *Id.* at § 1401(9). A child receives a FAPE, for purposes of the IDEA, if the program addresses the child's unique needs, provides adequate support services so that the child can take advantage of educational opportunities, and is in accord with the IEP. *Id*. A state must comply both procedurally and substantively with the IDEA. *Id*. at § 1400 et seq.

In determining whether a student has received a FAPE in compliance with the IDEA, the court conducts both a procedural and substantive inquiry. The court considers whether the school complied with the procedures set forth in the IDEA. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206–07 (1982). The court also evaluates whether the IEP in this case, or lack thereof, was reasonably calculated to enable the child to receive educational benefits. *Id*. Where a court identifies a procedural violation that denied a student a FAPE, the court need not address the second substantive prong of the inquiry. *Doug C. v. Haw. Dep't. of Educ.*, 720 F.3d 1038, 1043 (9th Cir. 2013).

Not all procedural violations constitute a denial of a FAPE. *R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 938 (9th Cir. 2007). A child is denied a FAPE when procedural inadequacies result in the loss of an educational opportunity, or seriously infringe on the parents' opportunity to participate in the IEP formulation process. *Doug C.*, 720 F.3d at 1043. A procedural error is harmless if the student is substantively ineligible for IDEA benefits. *R.B.*, 496 F.3d at 942.

## II. Eligibility for IDEA Benefits

The initial issue in this case is whether L.J. was substantively eligible for IDEA benefits, since the ALJ held he was not. A child is substantively eligible for special education and related services if he is a "child with a disability," which is statutorily defined, in relevant part, as a child with a serious emotional disturbance, other health impairment, or specific learning disability and who, by reason thereof, needs special education and related services. 20 U.S.C. § 1401(3)(A). California Education Code similarly provides that a "student with exceptional needs" who is eligible under § 1401(3)(A) must have an impairment that "requires instruction and services which cannot be provided with modification of the regular school program." Cal. Educ. Code §§ 56026(a), (b).

Even if a child has such a disability, he or she does not qualify for special education services if support provided through the regular school program is sufficient. 20 U.S.C. § 1401(3)(A); Cal. Educ. Code § 56026. "[S]pecial classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is

such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A).

The parties on appeal no longer dispute that L.J. should have been categorized as a child with a disability under three categories set forth in the statute. First, L.J. has a "specific learning disability" because he has exhibited a severe discrepancy between his intellectual ability and his achievement. 34 C.F.R. § 300.8(c)(10). Second, L.J. has an "other health impairment" because his ADHD and mood disorders interfere with his ability to progress academically and socially. 34 C.F.R. § 300.8(c)(9). Lastly, L.J.'s mood disorders constitute a "serious emotional disturbance." 34 C.F.R. § 300.8(c)(4).

The critical issue in this appeal therefore is whether L.J. demonstrated a need for special education services. This case differs from most IDEA cases in that L.J. never received an IEP because the School District continually maintained he had no qualifying disabilities. The ALJ agreed that he had no qualifying disabilities. The district court held that the ALJ was incorrect in this regard and that L.J. had qualifying disabilities. The district court went on to conclude, however, that L.J. was performing satisfactorily without the need for special education services. We must therefore determine whether general education was appropriate or whether L.J. exhibited a need for special education services.

The appropriateness of a student's eligibility should be assessed in terms of its appropriateness at the time of the child's evaluation and not from the perspective of a later time with the benefit of hindsight. *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999). When making this assessment of

whether an eligibility determination is "appropriate" under the IDEA, this court looks to the time of the child's evaluation by the School District. We employ what is termed the "snapshot" rule that instructs the court to judge the appropriateness of the determination on the basis of the information reasonably available to the parties at the time of the IEP meeting. *Id.* "An IEP must take into account what was and was not, objectively reasonable when the snapshot was taken." *Id.* (citation omitted). We judge the eligibility decision on the basis of whether it took the relevant information into account, not on whether or not it worked. *Id.*

In this case, it is undisputed that the snapshot period was the period surrounding the two IEP meetings: on May 30, 2012, in the third grade, and October 9, 2012, in the fourth grade. That was the critical period on which the School District based its eligibility decisions, and the district court correctly focused on L.J.'s eligibility for special education by looking to his behavior, academic progress, and social needs at that time. The district court was correct when it found that L.J. should have been categorized as a child with a disability within the meaning of the IDEA. L.J. had multiple disabilities, which manifested serious behavioral problems.

The district court nonetheless concluded that L.J. was not eligible for special education because he was academically performing satisfactorily without receiving special education services and on the basis of the general education curriculum. This was clear error because L.J. was receiving special services, including mental health counseling and assistance from a one-on-one paraeducator. These are not services offered to general education students.

This distinction is important.  General education is what is provided to non-disabled children in the classroom. Special education, on the other hand, is "specially designed instruction" to meet the unique needs of a child with a disability.  34 C.F.R. § 300.39(a)(1).  "Specially designed instruction" is defined under the IDEA regulations:

> *Specially designed instruction* means adapting, as appropriate to the needs of an eligible child under this part, the content, methodology, or delivery of instruction—
>
> (i) To address the unique needs of the child that result from the child's disability; and
>
> (ii) To ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children.

34 C.F.R. § 300.39(b)(3) (emphasis added).

The district court decided that L.J. did not need an IEP because, despite his multiple disabilities, L.J. was performing satisfactorily in general education.  The problem with the district court's analysis is that many of the services the district court viewed as general education services were in fact special education services tailored to L.J.'s situation. The district court thus classified many of the services L.J. received as general education, when they were not. Discussion of a few examples will make the point.

First, general education instruction does not provide for one-on-one direction. L.J. received special assistance in the third grade from a one-on-one paraeducator, pursuant to the parties agreement that year. The School District claims that the paraeducator "faded back considerably" by May 30, the date of the initial IEP meeting, but this is not accurate. The paraeducator continued to assist L.J. throughout the third grade.

Second, general education instruction does not provide for specially designed mental health services. The School District's position is that L.J. received only general education mental health services from Lincoln that the School District makes available to all students. The School District distinguishes such services from services received by special education students, which are specially designed mental health services.

The flaw in the School District's argument is that the mental health services that L.J. received from second grade through fourth grade were specially-designed for him. Such services included services that the School District described as follows: Assessments, Plan Development, Group and Individual Rehabilitation, Group and Individual Therapy, Family Therapy, and Collateral Family Group and Intensive Home-Based Services. The School District acknowledges that only students requiring special education receive an educationally-related mental health assessment. L.J. received two such mental health assessments. L.J. was referred to Lincoln by the School District's Director of Special Education and Psychological Services, and the School District acknowledged this means of referral is for special education students only.

Third, general education instruction does not typically include extensive clinical interventions by a School District behavior specialist. While it is not unusual for a behavior specialist to offer support to a general education teacher, here the School District's behavior specialist did much more. Throughout the third grade year, he designed specific BSPs in an attempt to meet L.J.'s needs. The plans included adapting the method and delivery of L.J.'s instruction, and strategies to promote a structured environment and reinforce positive behavior. The behavior specialist also designed a nine-hour training session for L.J.'s paraeducator. After training L.J.'s aide, the behavior specialist closely supervised him to ensure the interventions followed the new BSP.

The district court clearly erred by mischaracterizing all of these individualized services as general education available to all students, rather than as special education provided to students with disabilities. The court went on to conclude, erroneously, that L.J. did not require specialized assistance in the future on the ground that he was no longer exhibiting behaviors that interfered with his school performance. Granted, his condition had improved during the snapshot period, for by the time of the IEP meetings, L.J.'s impairments had been eased with the accommodations and services provided by the School District. With the assistance of medication and specially designed instruction, L.J. had periods of temporary behavioral and academic gain. L.J.'s teachers, service providers, and mother all reported that L.J. had made good progress in academics and improved his social skills with his classmates during the snapshot period.

Dr. Burke opined that his average or above-average academic testing scores showed academic achievement had not been impacted by any of his issues. Standardized tests

ranked L.J.'s academic performance in an overall average
range. Although there was progress, it was no doubt in a
setting where multiple services were being provided and the
progress must at least, in substantial part, be attributed to
those services. Moreover, L.J. has shown himself to be an
intelligent child, so his academic performance could have
been even more improved with the appropriate specially
designed instruction.

Yet, L.J. continued to have troubling behavioral and
academic issues during the snapshot period. The district
court did not adequately take these into account when it
decided there was no need for future specialized services.
The information available to the IEP team during the
snapshot period was dramatic.

L.J. threatened and attempted to kill himself on numerous
occasions. On May 29, 2012, the day before his initial IEP
meeting, L.J. attempted to kill himself by sticking his finger
in a light socket and putting items down his throat. On May
30, 2012, the day of his first eligibility determination, L.J.
could not have been doing well socially, behaviorally, or
academically at school because he was in extended care at a
psychiatric hospital. He was confined to the hospital for over
a week and missed at least six school days. L.J. was again
admitted for psychiatric hospitalization on July 17 and July
26, 2012. L.J. was detained as a danger to himself or others
because he was banging his head against walls and making
threats of harm.

The district court concluded that L.J.'s psychiatric
hospitalizations and suicide attempts were not relevant to his
eligibility for specialized instruction because they occurred
outside the school environment. Yet, the issue is whether his

disabilities interfered with his education and necessitated special services. It is hard to imagine how an emotional disturbance so severe that it resulted in repeated suicide attempts would not interfere with school performance. That he attempted suicide outside the school environment is immaterial. His emotional disturbance adversely affected his attendance and his teachers all reported that L.J.'s classroom absences, due to psychiatric hospitalizations, hurt his academic performance. To distinguish between where a student attempted suicide—between home and school—misses the point. The point being that whether having a suicidal ideation and attempting suicide interfered with L.J.'s education.

In fourth grade, in September, L.J. was suspended for two days after throwing rocks at and threatening to kill the school principal. The district court did not think his suspension was of great import, noting that it was only for two days. But this was not L.J.'s only incident. Shortly before the October 9, 2012, IEP meeting, L.J. was unable to ride the school bus because he refused to follow the bus driver's directions.

L.J. also continually had needs associated with his medication and treatment for his mood disorders and ADHD. By fourth grade, L.J. relied on psychotropic medications in order to attend school. His fourth grade teacher reported that L.J.'s functioning declined in the absence of medication or when it had no mitigating effects. School counselors repeatedly expressed their concern regarding L.J.'s medication management. The district court neglected to discuss L.J.'s ongoing needs associated with his medication.

L.J. clearly exhibited behavioral and academic difficulty during the snapshot period. He threatened and attempted to

kill himself on three occasions in 2012. In the fall, he frequently acted out at school, and continued to have needs associated with his medication regimen. The district court should not have discounted these facts. They demonstrate that L.J. required special education services.

Because L.J. is eligible for special education, the School District must formulate an IEP. We reverse the district court's decision and remand for it to order that the School District provide that remedy.

## III.     Procedural Violations of the IDEA

Procedural safeguards are built into the IDEA to ensure that a child's education is fair and appropriate and the parents have an opportunity to participate in the IEP formulation process. *Doug C.*, 720 F.3d at 1043. The record in this case reflects some serious violations of these safeguards by the School District.

The School District failed to disclose assessments, treatment plans, and progress notes from L.J.'s time at Lincoln. The district court erred in concluding that this failure did not interfere with L.J.'s mother's opportunity to participate in the IEP formulation process.

Under the IDEA, parents have the right to informed consent. 20 U.S.C. § 1414(a)(1)(D). Consent means that the parent has been fully informed of all information relevant to the activity for which consent is sought. 34 C.F.R. § 300.9(a). To guarantee parents the ability to make informed decisions about their child's education, the IDEA gives them the right to examine all pertinent education records relating to their child. 20 U.S.C. § 1415(b)(1). The Lincoln records

constitute such education records and should have been disclosed to L.J.'s mother.

Parents also have the right to invite to attend IEP meetings individuals with knowledge or special expertise regarding their child. 34 C.F.R. § 300.321(a)(6). L.J.'s mother had the right to have L.J.'s mental health providers at both the May and October IEP meetings. *Id*. Without knowledge of the Lincoln records, however, L.J.'s mother waived the attendance of his mental health clinicians at the IEP meetings. At the very least, L.J.'s parent should have received complete copies of the Lincoln records so that she could provide informed consent regarding the exclusion of his mental health providers from the IEP team. Had L.J.'s mother been aware of the content of the Lincoln records, she may well not have waived the mental health providers' attendance.

The School District also failed to conduct a health assessment for the purpose of determining how L.J.'s health, and particularly his medications, affected his performance. The district court held that this error did not infringe on L.J.'s mother's ability to participate in the IEP process because L.J.'s medications were not administered at school. We fail to see that the need for a health assessment should depend on where medications are administered, and we are cited to nothing in support of the proposition.

Under the IDEA, the School District must conduct a "full and initial evaluation," one which ensures the child is assessed in "all areas of suspected disability." 20 U.S.C. §§ 1414(a)(1)(A), (b)(3)(B). This requirement allows the child's IEP team to have a complete picture of the child's functional, developmental, and academic needs. When a

student has been diagnosed as having a chronic illness, as L.J. was, the student may be referred to the School District for a health assessment. 5 Cal. Code Reg. § 3021.1. A health assessment focuses on diagnoses, health history, and those specific health needs while in school which are necessary to assist a child with a disability. The regulations then require that the IEP team review, among other things, the "possible medical side effects and complications of treatment that could affect school functioning." *Id.* The district court erred when it dismissed the School District's failure to conduct a health assessment, depriving L.J. of an educational benefit. *See Doug C.*, 720 F.3d at 1043 (a FAPE is denied where procedural inadequacies result in loss of educational benefits).

Here, there is reason to believe that alternative services would have at least been more seriously considered during the IEP process if the School District had assessed L.J.'s health, including the effects of his medication on his health. The record evidence showed that L.J. continually had needs associated with his medication and treatment, which adversely impacted his academic, behavioral, and social performance. Because his health and the impacts of his medication were never assessed, no matter what assistance L.J. received, the School District would remain unable to appropriately address those needs.

In sum, the School District clearly violated important procedural safeguards set forth in the IDEA. The School District failed to disclose assessments, treatment plans, and progress notes kept by Lincoln, which deprived L.J.'s mother of her right to informed consent. The School District also failed to conduct a health assessment, which rendered the

School District and IEP team unable to evaluate and address L.J.'s medication and treatment related needs.

When this matter returns to the School District for the preparation of an IEP, the School District must comply with the IDEA's procedural safeguards. Additional procedural violations can only result in the further protraction of proceedings and costly financial and emotional burdens for all those involved.

## CONCLUSION

L.J. is a child with disabilities within the meaning of the IDEA and needs special education. The judgment of the district court is reversed and the matter remanded to the district court with instruction to order the School District to provide an appropriate remedy.

Costs are awarded to Plaintiffs-Appellants.

**REVERSED** and **REMANDED**.