FILED
United States Court of Appeals
Tenth Circuit

December 20, 2022

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

D.T., a minor, by and through his parent
Yasiris T.,

     Plaintiff - Appellant,

v.

CHERRY CREEK SCHOOL DISTRICT
NO. 5,

     Defendant - Appellee.

No. 21-1265

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:20-CV-00706-LTB-SKC)**
_____

Igor Raykin (Michael Nolt with him on the briefs), Kishinevsky & Raykin, Attorneys at Law, Aurora, Colorado, for Plaintiff - Appellant.

Elliott V. Hood (Elizabeth R. Friel with him on the brief), Caplan and Earnest LLC, Boulder, Colorado, for Defendant – Appellee.
_____

Before **HOLMES**, Chief Judge, **MURPHY**, and **HARTZ**, Circuit Judges.
_____

**MURPHY**, Circuit Judge.
_____

## I.　INTRODUCTION

In the fall of 2015, D.T. enrolled as a freshman at Cherokee Trail High School in Aurora, Colorado. During his tenure at Cherokee Trail, he suffered from

depression and a general decline in academic performance. While D.T. struggled with his mental health, his mother regularly communicated with school officials regarding his well-being and coordinated in-school support. During the first semester of his junior year, D.T. was reported for making a school shooting threat. As a result, he was expelled from Cherokee Trail and the Cherry Creek School District ("the District") initiated a special education assessment. In December 2017, the District concluded D.T. suffered from a Serious Emotional Disability and approved an individualized education program ("IEP") to assist his learning.

D.T. appeals from the district court decision confirming an administrative ruling that the District did not deny him access to a free, appropriate public education ("FAPE") as required by the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C. § 1400–19; *see also infra* III.a. (explaining the unusual manner in which IDEA litigation proceeds in federal court). He argues the District knew or should have known he suffered from an IDEA-recognized disability prior to initiating a special education evaluation in November 2017. D.T. asks this court to conclude the District violated its obligation to identify, or "child find," students with disabilities who require supplementary academic supports. *See id*. § 1412(a)(3). To the contrary, throughout his enrollment at Cherokee Trail, the District acted reasonably to preserve his access to the benefit of general education. The District's duty to assess and provide D.T. with special education services did not begin until his emotional

dysfunction[1] manifested in the school environment by way of his shooting threat. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we **affirm** the district court ruling.

## II.    BACKGROUND

### a.  FACTUAL HISTORY

D.T. and his family moved from Florida to Colorado in 2015. Shortly thereafter, he began his freshman year at Cherokee Trail. Cherokee Trail had a much larger student body than that to which D.T. was accustomed. Although he performed well academically his first year, he expressed difficulty connecting with his peers and teachers in his new environment. In January 2016, D.T.'s mother first emailed his assigned school counselor, Mr. Jasurda, conveying concern about D.T.'s well-being. She described her son as depressed and struggling to acclimate to Cherokee Trail. D.T. completed his freshman year with mostly As and Bs, earning a 3.36 weighted GPA.[2]

---

[1] As described by the Colorado Exceptional Children's Education Act ("ECEA"), emotional dysfunction refers to pervasive inappropriate behaviors or feelings in otherwise normal settings that interfere with social or academic development. *See e.g.*, 1 C.C.R. 301-8 § 2.08(3). In addition to IDEA and its federal enabling regulations, the ECEA includes jurisdiction-specific requirements for special education administration. *See infra* § III.b. Emotional dysfunction is also closely associated with emotional dysregulation, which describes difficulty maintaining emotional reactions within traditionally accepted norms. *See generally*, AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 65, 155 (5th Ed. 2013).

[2] The GPA scale for honors courses is higher than grade level courses. A weighted GPA factors in this higher scale to reflect the added rigor of honors courses. An unweighted GPA does not weigh courses on different scales.

During his sophomore year, D.T.'s grades began a downward tilt. In preparation for applying to college, he enrolled in three honors classes: Chemistry, English, and Spanish. Mr. Jasurda recommended he switch to grade level English after he earned a D in his first semester of the honors course, but he declined. He received a 2.48 weighted GPA during fall semester of his sophomore year and a 2.35 weighted GPA the following spring. He failed his spring honors English course. D.T. enrolled in grade level English during the following summer term earning a B+.

Sophomore year also brought strain for D.T. outside the classroom. His academic file indicates "an after-school concern" was reported on October 6, 2016. Mr. Jasurda contacted the local Sheriff's Department to conduct a welfare check and D.T. was reported as "OK." On April 23, 2017, D.T.'s mother sent Mr. Jasurda an email relaying D.T.'s struggles with suicidal ideation. Her message described a recent incident in which he attempted to "jump in front of a car" after a fight with his family. The following day, the school psychologist, Dr. Liguori, conducted a suicide risk assessment and concluded D.T. was of high concern. Dr. Liguori referred him to the Colorado Crisis Center for follow-up evaluation. Dr. Liguori also provided D.T.'s mother with a list of therapists and a referral to the Second Wind Fund, which provides financial assistance to families with children in need of mental health counseling. On May 7, his mother emailed Dr. Liguori stating D.T. "seem[ed] to have turned things around" after the risk assessment but has since experienced emotional distress at home and potentially abused drugs. Her message added, "calling the therapist you gave me will only waste those peoples time as he will not cooperate."

Unfortunately, fall semester of his junior year provided further tumult. On September 14, 2017, his mother emailed Mr. Jasurda reiterating D.T.'s at-home behavioral issues and her suspicions of his drug use. Mr. Jasurda met with him the following day and discussed strategies to approach his academic and familial concerns. Based on their conversation, Mr. Jasurda did not perceive he was using drugs, but D.T. reported feeling depressed and discontented with family life. Three days later, on September 18, D.T. had an argument with his parents which resulted in him leaving the house late at night. The next morning, he checked into Children's Hospital Colorado for mental health evaluation and inpatient psychiatric treatment. He was discharged on September 24 with diagnoses of Major Depressive Disorder and Unspecified Anxiety Disorder. The discharge notes recommended individual therapy and a transition meeting to prepare for going back to school. Two days later, Dr. Liguori met with D.T. and his mother to discuss a re-entry plan. The plan called for Dr. Liguori and Mr. Jasurda to regularly check-in with him and coordinate with teachers to provide academic accommodations, such as clarifications on outstanding work, waiver of non-essential assignments, and additional tutoring.

On September 30, D.T.'s mother emailed Dr. Liguori to report she caught her son "doing weed." Two weeks later, on October 11, she emailed Dr. Liguori and Mr. Jasurda requesting a § 504 plan.[3] *See* Rehabilitation Act of 1973, Pub. L. No. 93-112,

---

[3] Like IDEA, § 504 requires students with disabilities be provided FAPE. *See* 29 U.S.C. § 794; 34 C.F.R. § 104.33(a). Unlike IDEA, which focuses on special education, § 504 encompasses academic aids within regular *or* special education. *See*

87 Stat. 355-94 (codified as amended at 29 U.S.C. §§ 701–97). Dr. Liguori offered a preliminary meeting that week but indicated it would take longer to set up a formal § 504 review. On October 13, D.T.'s mother met with Dr. Liguori to discuss implementing more immediate academic supports. The school referred D.T. to Ms. Lewis, a teacher who specializes in helping students with organizational skills. Ms. Lewis sent two hall passes to meet with him, but D.T. did not respond. He also did not report when Mr. Jasurda sent a hall pass to him on November 9 after his father notified Mr. Jasurda about a recent argument he had with his son.

On November 10, a student reported D.T. had threatened to "shoot up the school." School officials convened a threat assessment, at which D.T. admitted to the statements but denied any desire to hurt anyone. D.T. left school after being dismissed from the evaluation and he called his mother saying he was going to hurt himself. Shortly thereafter, he was admitted to Children's Hospital for inpatient psychiatric treatment. On November 15, he discharged from the hospital with diagnoses of recurrent and severe Major Depressive Disorder without psychotic features and Generalized Anxiety Disorder. The discharge notes indicated he was not a threat to others but struggled with his own safety. The hospital also recommended an IEP "to help emotional support." As a result of his threat, D.T. was first suspended

---

e.g., *McIntyre v. Eugene Sch. Dist. 4J*, 976 F.3d 902, 911 (9th Cir. 2020). A § 504 plan, therefore, is a written document describing a range of regular or special education services used to assist a student's learning. *Id*. Due to § 504's broader scope, a more specialized IEP may be used to satisfy § 504 requirements, but a § 504 plan may not be used to satisfy IDEA requirements. *Id*. at 912; *see also Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Sch.*, 565 F.3d 1232, 1246 (10th Cir. 2009).

and then expelled from Cherokee Trail.[4] D.T. transferred to the District's home/hospital program. On November 17, Dr. Liguori conducted a preliminary psychological assessment as part of an evaluation for special education services. The report concluded D.T. had average cognitive ability but suffered emotional regulation issues associated with anxiety and depression. Dr. Liguori noted he "may benefit from added support within the home and school environments to address his social and emotional needs."

On December 13, the District held a meeting to determine whether D.T. was eligible for special education services under IDEA. The group concluded D.T. met criteria for a child with a Serious Emotional Disability ("SED"). They determined D.T.'s SED disrupted the reasonable benefit of his general education and necessitated special education services. The evaluating team also determined D.T.'s emotional dysfunction was not due solely to "social maladjustment." Accordingly, the team developed an IEP with academic accommodations and a Behavior Intervention Plan ("BIP") to assist D.T. with emotion regulation.

D.T. completed his junior fall semester with a GPA below 2.0. After winter break, he transferred to George Washington High School in the Denver Public School District for the spring 2018 semester. His IEP was transferred to George Washington.

---

[4] Prior to D.T.'s expulsion, a "manifest determination" meeting was conducted to evaluate whether the shooting threat arose out of D.T.'s disability. The determination team concluded the misconduct did not relate to a disability and therefore D.T. was subject to expulsion review. D.T. does not challenge his expulsion nor the District's determination that his threat was not a manifestation of his disability.

D.T. reported initial academic improvement at George Washington due to additional accommodations and teacher support. He earned a weighted GPA of 3.59 during his junior spring semester. D.T. testified his grades subsequently fell his senior year because he was "abusing drugs and lost focus." He earned a weighted GPA of 2.64 his senior fall semester and 2.55 his senior spring semester. D.T. graduated from George Washington in May 2019.

### b.    PROCEDURAL HISTORY

Through his mother, D.T. filed a due process complaint with the Colorado Department of Education on April 23, 2019. The complaint stated the District knew or should have known he suffered from an SED as early as April 2017. D.T. argued the District, therefore, violated its child find duty by not commencing IEP procedures until November 2017. On December 10 and 11, 2019, a due process hearing was held before an administrative law judge in the Colorado Office of Administrative Courts. The ALJ found "insufficient evidence of the necessary SED qualifying conditions to suspect that D.T. was a child with a disability requiring special education . . . until November 2017 when D.T. threatened to 'shoot up the school.'"

D.T. brought a civil action in the United States District Court for the District of Colorado. *See* 20 U.S.C. § 1415(i)(2); 34 C.F.R. § 300.516. The district court agreed with the administrative findings. Although D.T. met the criteria for an SED by November 2017, the district court affirmed that not enough evidence existed prior to the shooting threat to trigger the District's statutory child find obligations. The

8

district court emphasized that D.T.'s educational benefit was only undermined when his emotional dysfunction manifested in the school setting by way of his threat.

## III.   ANALYSIS

### a.   STANDARD OF REVIEW

IDEA initially places IEP disputes under state-based administrative review. *See* 20 U.S.C. § 1415(f). Administrative adjudication of statutory claims is typically given substantial deference. *See Garcia v. Bd. of Educ. of Albuquerque Pub. Sch.*, 520 F.3d 1116, 1125 (10th Cir. 2008). IDEA, however, requires district courts to apply a modified de novo standard when reviewing administrative decisions. *Id.* Under this standard, a district court must: a) receive the records of the administrative proceedings; b) hear additional evidence at the request of a party; and c) base its decision on the preponderance of evidence. 20 U.S.C. § 1415(i)(2)(C). When conducting this review, district courts must give "due weight" to agency findings of fact, which are presumed correct. *Garcia*, 520 F.3d at 1125. This court applies the same "due weight" de novo standard in conducting appellate review of district court decisions under IDEA.[5] *Id.*

---

[5] This court has previously recognized this unusual standard of review upon appeal: "We recognize, though, that, while we are bound to apply a modified de novo standard of review, our rule represents the distinct minority position among circuit courts, *see, e.g.*, *Light v. Parkway C–2 Sch. Dist.*, 41 F.3d 1223, 1229 (8th Cir.1994); *Oberti v. Bd. of Educ.*, 995 F.2d 1204, 1220 (3d Cir.1993); *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1310 (9th Cir.1987). Our modified de novo approach also runs counter to the general standard of review suggested in Fed.R.Civ.P. 52(a). En banc reconsideration of our standard of review may well be appropriate at some point." *Thompson R2-J Sch. Dist. v. Luke P.*, ex rel. Jeff P., 540 F.3d 1143, 1150 n.6

### b. IDEA & ECEA

Three bodies of law direct IDEA claims: first, IDEA itself; second, federal enabling regulations; and third, jurisdiction-specific regulations. *See* 20 U.S.C. § 1400–19; 34 C.F.R. Part 300; 1 C.C.R. 301-8. IDEA announces the broad requirement for states to provide students with free, appropriate public education, or "FAPE," but relies on specific federal and state regulations for implementation. *See* 20 U.S.C. § 1412(a)(1); *see generally Ass'n for Cmty. Living in Colo. v. Romer*, 992 F.2d 1040, 1042–43 (10th Cir. 1993). The basic vehicle to achieve FAPE is the development of an IEP for all eligible students. *See Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017). IDEA requires an IEP for each child with a recognized disability. 20 U.S.C. § 1412(a)(4). D.T.'s claims concern two interrelated issues pertinent to FAPE: when a school's "child find" obligation is triggered and what qualifies as a serious emotional disability, or "SED."

The child find obligation requires schools to proactively "identify, locate, and evaluate" students with disabilities who may need special education or other academic supports. *Id*. § 1412(a)(3). A "child with a disability" is a student with a qualifying disability under IDEA and "who, by reason thereof, needs special education and related services." 34 C.F.R. § 300.8(a)(1); 20 U.S.C. § 1401(3)(A). Federal regulation clarifies child find is triggered when children "are *suspected* of being a child with a disability . . . even though they are advancing from grade to

---

(10th Cir. 2008). As in *Luke P*., however, the adopted standard of review does not alter the outcome of this case. *Id*.

10

grade." 34 C.F.R. § 300.111(c)(1) (emphasis added). Thus, the child find duty is triggered when the school district has reasonable suspicion to believe that a student is a "child with a disability." *See J.M. ex rel. C.M v. Summit City Bd. of Educ.*, 39 F.4th 126, 142 (3d Cir. 2022); *see also Wiesenberg v. Bd. of Educ. of Salt Lake City Sch. Dist.*, 181 F. Supp. 2d 1307, 1311 (D. Utah 2002). Districts must act "within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability." *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 250 (3d Cir. 2012) (quotation omitted); *see also Spring Branch Indep. Sch. Dist. v. O.W. ex rel. Hannah W.*, 961 F.3d 781, 791 (5th Cir. 2020). When a disability is found, IEP or individualized services assessment commences. 20 U.S.C. § 1412(a)(4).

IDEA expressly includes "serious emotional disturbance" as a qualifying disability for purposes of receiving special education. *See* 20 U.S.C. § 1401(3)(A)(i). Federal regulation defines SED with five criteria, at least one of which must adversely affect academic performance and be displayed "over a long period of time and to a marked degree":

> (A)　An inability to learn that cannot be explained by intellectual, sensory, or health factors.
> (B)　An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.
> (C)　Inappropriate types of behavior or feelings under normal circumstances.
> (D)　A general pervasive mood of unhappiness or depression.
> (E)　A tendency to develop physical symptoms or fears associated with personal or school problems.

34 C.F.R. § 300.8(c)(4)(i).

11

In addition to these federal criteria, Colorado's Exceptional Children's Education Act ("ECEA") provides requirements for determining if a student has an SED. *See* 1 C.C.R. 301-8 § 2.08(3). As a threshold matter, the child's SED must yield either an academic impairment which interferes with their ability to receive the benefit of general education or a socio-emotional impairment which impedes their ability to maintain interpersonal relationships. *Id*. § 2.08(3)(b)(i)–(ii). Colorado's ECEA also includes four mandatory qualifiers for an SED determination:

> i) A variety of instructional and/or behavioral interventions were implemented within general education and the child remains unable to receive reasonable educational benefit from general education.
> ii) Indicators of social/emotional dysfunction exist to a marked degree; that is, at a rate and intensity above the child's peers and outside of his or her cultural norms and the range of normal development expectations.
> iii) Indicators of social/emotional dysfunction are pervasive and are observable in at least two different settings within the child's environment. For children who are attending school, one of the environments shall be school.
> iv) Indicators of social/emotional dysfunction have existed over a period of time and are not isolated incidents or transient, situational responses to stressors in the child's environment.

*Id*. § 2.08(3)(c).

Finally, the ECEA emphasizes an SED cannot be the product of mere "social maladjust[ment]." *Id*. § 2.08(3)(d). Collectively, to meet SED requirements under federal and state law in Colorado, an in-school student must experience social or emotional dysfunction that substantially impairs educational attainment or social

development. Such dysfunction must be consistent, unusual, present in the school environment, and unmitigated by other academic or behavioral interventions.

### c. CHILD FIND & SED

D.T. urges this court to determine the District should have suspected he had a disability prior to when it began IEP assessment. He argues enough evidence existed to trigger the District's child find obligation as early as April 2017, when the school's suicide risk assessment suggested a high degree of concern, but no later than September 2017, when he was first hospitalized for mental health treatment. This court agrees with the district court and administrative findings that D.T. did not satisfy the criteria for an SED determination until his November 2017 shooting threat, at which point the District's child find duty began.

The two issues presented, when D.T. qualified as having an SED and when the District's child find obligation commenced, fit snugly together in this particular case. As discussed above, federal and state regulations prescribe discrete criteria for an SED determination. 34 C.F.R. § 300.8(c)(4)(i); 1 C.C.R. 301-8 § 2.08(3). By contrast, determining child find duties implicates a subjective inquiry into when a school should reasonably suspect a student has a qualifying disability. 34 C.F.R. § 300.111(c)(1); *D.K*, 696 F.3d at 250; *Spring Branch Indep. Sch. Dist.*, 961 F.3d at 791. The criteria used to classify an SED can act as a guide for determining whether a school had adequate information to implement special education supports. *See e.g., Leigh Ann H. ex rel. K.S. v. Riesel Indep. Sch. Dist.*, 18 F.4th 788, 797 (5th Cir. 2021). As applied to D.T., three unmet elements of an SED under Colorado's ECEA

13

indicate the District's child find obligation was not breached. Until November 2017, D.T.'s emotional dysfunction had not manifested in the school environment; the District actively engaged him with alternative interventions; and his struggles were readily explainable by acute, non-academic stressors.

Under Colorado law, an SED determination requires the student display pervasive emotional dysfunction in at least two settings. 1 C.C.R. 301-8 § 2.08(3)(c)(iii). For students enrolled in traditional school, one of these settings must be at school. *Id*. Given IDEA's mission of protecting students' FAPE, such a nexus between a student's school and their disability is crucial. *See Sytsema ex rel. Sytsema v. Acad. Sch. Dist. No. 20*, 538 F.3d 1306, 1312 (10th Cir. 2008). Until D.T.'s shooting threat, in-school manifestation of his emotional dysfunction was scant. The incidents he uses to illustrate that the District violated its child find duty predominantly stem from at-home conduct. The April 2017 email which D.T. argues initially placed the District on notice of his disability described self-harm arising from arguments with his family. A follow-up email in May 2017 primarily discussed his at-home behavior, including "tantrums over food" and leaving the house without permission. Similarly, his September 2017 hospitalization resulted directly from an argument with his family. Despite these difficulties at home, the District reported no substantial behavioral issues during school, and he continued to engage in his studies. D.T. clearly struggled to regulate his emotions with his family throughout 2017, but these behavioral patterns did not manifest in the school environment and disrupt his ability to receive the benefit of general education.

14

Without evidence of emotional dysfunction in the school setting, D.T. urges this court look to his negative attitude about school and his declining grades as evidence of in-school manifestation of an SED. D.T. testified to having difficulty connecting socially with teachers and students upon arriving at Cherokee Trail. He also noted his depression impacted his motivation to complete his studies during his sophomore and junior years. Without more, these facts do not qualify as the type of in-school manifestation of emotional dysfunction required for an SED determination or to trigger child find protocols. *See* 34 C.F.R. § 300.8(c)(4)(i). Until November 2017, D.T. received the reasonable benefit of general education. Except for sophomore spring honors English, D.T. passed all his courses and did not demonstrate an academic or social impairment which created an inability to learn or connect with others. *See id*.; 1 C.C.R. 301-8 § 2.08(3)(b). Although this court takes seriously the toll depression and anxiety take on students' learning, we do not construe mere declining grades and social difficulty as the kind of pervasive disability IDEA contemplates for an SED determination. *See e.g.*, *Leigh Ann H*., 18 F.4th at 797 ("[M]ixed academic success does not—in itself—trigger a school district's obligation to evaluate"); *Indep. Sch. Dist. No. 283 v. E.M.D.H.*, 960 F.3d 1073, 1081 (8th Cir. 2020) (recognizing an SED when a long-term "panoply" of mental health issues left a student terrified to even attend school); *L.J. v. Pittsburg Unified Sch. Dist.*, 850 F.3d 996, 1002 (9th Cir. 2017) (recognizing an SED when multiple suicide attempts resulted in substantial school absences and the child repeatedly injured or threatened to injure his classmates and teachers).

Colorado's ECEA also requires a variety of instructional or behavioral interventions within general education be implemented without success prior to an SED determination. *See* 1 C.C.R. 301-8 § 2.08(3)(c)(i); *see also J.M.*, 39 F.4th at 142 (3d Cir. 2022). The District went to great lengths to ensure D.T.'s access to FAPE upon becoming aware of his struggles with mental health. When faced with acute mental health concerns, the school conducted a risk assessment and a robust re-entry plan with individualized supports. The school also consistently offered D.T. additional counseling and customized academic help. For those additional academic supports in which he participated, the school observed progress. For example, D.T.'s counselor attempted to redirect him to a grade level English course when he was struggling in the honors version of the class, and he succeeded when placed in the grade level course during summer school. On several occasions the school also provided outside therapeutic referral, additional counseling, and one-on-one educational services, with which D.T. refused to engage.[6] When paired with the lack of in-school manifestation of emotional dysfunction, the school had no reason to suspect its general education supports were insufficient. Until November 2017, D.T. maintained the capacity to complete course material and meet academic standards, indicating his FAPE was preserved. *See Durbrow v. Cobb Cnty. Sch. Dist.*, 887 F.3d 1182, 1194 (11th Cir. 2018).

---

[6] D.T. does not argue he declined any of these services because his disability prevented him from taking advantage of them.

Finally, Colorado law requires SED determinations to include lasting indications of emotional dysfunction that are not "isolated incidents or transient, situational responses in the child's environment." 1 C.C.R. 301-8 § 2.08(3)(c)(iv). There were several reasonable, acute, and non-academic explanations for D.T.'s mental health struggles. As discussed above, his episodes of emotional distress were strongly connected with familial disputes outside the school environment. Further, the record demonstrates he struggled with moving from Florida to Colorado and settling into an unfamiliar learning environment. D.T. also took a rigorous course load against his counselor's advice, and he performed better when it was pared back. Lastly, he began engaging in regular drug use during his sophomore and junior years.[7] These circumstances illustrate repeated situational responses to negative occurrences in D.T.'s life. Collectively, they represent several reasons why the school would not interpret his mental health struggles as a disability, but as reactions to independent stressors. In addition to the District's academic interventions and a lack of in-school manifestation of his emotional dysfunction, these acute difficulties support the conclusion that reasonable suspicion of disability did not arise prior to November 2017. *See Krawietz v. Galveston Indep. Sch. Dist.*, 900 F.3d 673, 677 (5th

---

[7] D.T.'s testimony indicates he ceased his drug use upon transferring to George Washington High School and performed well in his spring 2018 semester. During his senior year, however, he returned to abusing drugs and his grades fell to marks similar to those he earned during his sophomore year at Cherokee Trail. His grades fell during his senior year despite the support of his IEP.

Cir. 2018) (utilizing a totality-of-the-circumstances approach in the "child find" context).

D.T. suggests a student's hospitalization should be given particular weight in determining if child find obligations have begun. Hospitalization signals a degree of severity and concretely interferes with a student's ability to attend school. *See L.J.*, 850 F.3d at 1006. Nonetheless, the inquiry of whether a school should reasonably suspect a child has a disability under IDEA relies on several factors, of which hospitalization is but one. D.T. clearly struggled with mental health throughout 2017. Even with hospitalization, however, not enough evidence existed to trigger the District's child find duties until his emotional dysfunction manifested in the school environment in the form of his shooting threat. Prior to November 2017, the District implemented several interventions to maintain D.T.'s access to FAPE and multiple non-academic difficulties existed in D.T.'s environment to explain his mental health struggles. After the shooting threat was made, D.T.'s emotional dysfunction impacted his ability to receive the benefit of general education and the District fulfilled its child find duty by acting promptly to assess him for special education services.

## IV. CONCLUSION

For those reasons set out above, the order entered by the United States District Court for the District of Colorado is hereby **affirmed**.