**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-3391
_____

J.M., individually and o/b/o C.M.; E.M., individually and
o/b/o C.M.,
Appellants

v.

SUMMIT CITY BOARD OF EDUCATION
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-19-cv-00159)
District Judge:  Honorable Kevin McNulty
_____

Argued:  October 26, 2021

Before:  GREENAWAY, JR., PHIPPS, and COWEN,[*]
*Circuit Judges*.

(Filed: July 1, 2022)
_____

---

[*] The Honorable Robert E. Cowen participated in oral argument, retired, and resumed active status for the disposition of this case.

Thomas J. O'Leary       [ARGUED]
Walsh Pizzi O'Reilly & Falanga
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ 07102

*Counsel for Appellants*

Jennifer N. Rosen Valverde    [ARGUED]
Rutgers University School of Law
Special Education Clinic
123 Washington Street
Newark, NJ 07102

*Counsel for Amici/Appellants*

John B. Comegno II       [ARGUED]
Anne R. Myers
Comegno Law Group
521 Pleasant Valley Avenue
Moorestown, NJ 08057

*Counsel for Appellee*

_____

PHIPPS, *Circuit Judge*.

This is a dispute about the timing of a school district's provision of special education and related services to a child with autism. Although the school district provided those services to the child after he was diagnosed with autism in April 2017, it had denied the child those services fourteen months earlier. At that time, in February 2016, the child was six years old and in first grade, and the school district determined that he was ineligible for those services because he was not disabled and did not need them.

2

The child's parents disagreed with that ineligibility determination and sought redress under the Individuals with Disabilities Education Act (the 'IDEA') and § 504 of the Rehabilitation Act. In the administrative grievance that they filed against the school district, they asserted that the school district violated its statutory obligation to identify, locate, and evaluate children with disabilities. On the premise that the school district did not fulfill that duty, the parents claimed that the school district denied their child his statutory right to a free appropriate public education (a 'FAPE').

The parents' claims did not succeed at the administrative level or in the District Court. After holding an evidentiary hearing, a hearing officer denied the parents' administrative grievance. To dispute that outcome along with the hearing officer's evidentiary rulings, the parents filed a complaint in federal court. But the District Court upheld the hearing officer's determination and entered summary judgment in the school district's favor.

The parents have now appealed the District Court's ruling. Reviewing the District Court's legal conclusions *de novo*, its factual findings for clear error, and its evidentiary rulings for abuse of discretion, *see Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 430 (3d Cir. 2013); *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 760 (3d Cir. 1995), we will affirm the judgment for the reasons below.

## I. FACTUAL BACKGROUND

### A. The Four Months Before C.M. Enrolled in First Grade in the Summit Public School District

From his infancy through kindergarten, C.M. attended day care full-time. He met his developmental milestones, and the day care described his participation and adjustment to kindergarten as good and his behavior as fairly typical. But toward the end of kindergarten, in May 2015, he began to have

meltdowns at day care. The day care staff could not manage C.M.'s behavior, and they asked his parents to remove him from the day care, which his parents did.

Prompted by concerns over his behavior (but not his academic performance), C.M.'s parents retained Dr. Carolyn McGuffog, a clinical psychologist and school neuropsychologist, to evaluate C.M. In July and August of 2015, Dr. McGuffog administered sixteen neuropsychological tests to C.M. over the course of four days.

### B. C.M.'s First Month of First Grade in the Summit Public School District

In September 2015, C.M. started first grade in the Summit Public School District. Despite Dr. McGuffog's admonition that it was "very, very important to notify the school up front," C.M.'s parents did not alert the school district or his teacher to his meltdowns in kindergarten. Hr'g Tr. at 51:1–2 (June 8, 2018) (testimony of Dr. Carolyn McGuffog) (JA1241). Similarly, before the start of school, C.M.'s parents did not inform anyone at Summit that they had retained Dr. McGuffog to evaluate C.M.

But even without that upfront notice, by the middle of September, Summit's staff recognized that C.M. was displaying behavioral problems in class. He got angry quickly, and in frustration he would shout, push desks and staff, throw materials, leave the room, hide under his desk, or refuse to talk. He was removed from the classroom twice for disruptive behavior, but after speaking with the school psychologist, he calmed down and was able to return to the classroom and participate. After one of those incidents, Summit's staff contacted C.M.'s parents and learned for the first time about his behavioral issues at the end of kindergarten.

By the end of C.M.'s first month of first grade, Summit had assembled a multidisciplinary team to examine potential

4

interventions in the classroom. That team consisted of the school principal, the school psychologist, a special-education teacher, a basic-skills teacher (who provides general-education supplemental instruction), and C.M.'s general-education teacher. They met in late September to identify and implement the least restrictive classroom interventions that would stabilize C.M.'s behavior.

After developing an intervention plan, the team implemented several interventions. Those included having places in the classroom for C.M. to go when he became upset, having C.M. participate in a lunch-time social-skills group once a week, and placing a card on C.M.'s desk to remind him of certain rules, such as to use kind words and to avoid hurting his friends. The intervention plan also called for rewarding C.M. with Pokémon cards for following those rules. In addition to those behavioral interventions, the team implemented interventions to assist C.M. academically. The team realized that C.M. had begun to experience academic difficulties, and it arranged for him to receive extra reading lessons four days a week and participate in an after-school basic-skills program twice a week.

Finally, the intervention team established a plan for monitoring the effects of these interventions, and it scheduled a second meeting for November 18 to assess the effects of the interventions.

### C. The Results of the McGuffog Report and the Broadening Evaluation of C.M.

In early October, Dr. McGuffog completed a forty-eight-page report on her evaluations and shared it with C.M.'s parents. That report provided a detailed analysis of C.M.'s test results, and they were quite mixed. In several areas, C.M. demonstrated cognitive strength and normal development, such as a very high nonverbal intelligence, advanced mathematical skills, an average working memory, and average

reading scores. But the test results also revealed areas of concern. C.M. had a notable weakness in inhibitory control, and although he barely met the minimum age requirement for one of the tests, it showed that he had significant problems with attentional regulation and impulsivity. The variation in the test results led Dr. McGuffog to observe that C.M. "presents with a complex array of neurocognitive strengths and weaknesses that poses a challenging diagnostic challenge, particularly given his young age." McGuffog Neuropsychological Evaluation Report at 36 (Oct. 8, 2015) (JA1720).

Despite the challenges, Dr. McGuffog made certain diagnoses. She determined that C.M. had three disorders: a language disorder, a social (pragmatic) communication disorder, and a specific learning disorder. She further recognized that C.M.'s test results were suggestive of autism and ADHD, but due to the combination of C.M.'s strengths, weaknesses, and young age, Dr. McGuffog declined to diagnose him with autism or ADHD. Instead, she issued 'rule-out diagnoses' for autism and ADHD, meaning that while she did not diagnose those conditions, she could not rule them out either.

Dr. McGuffog also made several recommendations for Summit with respect to C.M.'s schooling. She suggested that C.M. receive instruction in social skills, especially by means of a social-skills group. She encouraged Summit to implement behavioral supports and to provide academic support in language arts. She also recommended that C.M. undergo two more evaluations – one for speech and language, the other for occupational therapy.

Even before it received those recommendations, Summit's intervention team had begun – on its own – to implement many of those interventions, such as the use of a social-skills group and a number of behavioral supports. And by early February 2016, Summit had implemented all of Dr. McGuffog's recommendations for C.M.'s schooling.

6

Dr. McGuffog also made recommendations for C.M.'s parents. Based on those recommendations, they retained an occupational therapist and a psychologist to evaluate C.M. and prepare reports on their findings. Also, on Dr. McGuffog's advice, the parents scheduled weekly appointments for C.M. with an occupational therapist and a psychologist.

### D. C.M.'s Parents Request that Summit Evaluate C.M. for Special Education

Although not recommended in the McGuffog Report, C.M.'s parents requested, on October 26, 2015, that Summit evaluate C.M. for special education and related services. In response, Summit assembled a multidisciplinary group of nine staff members and other professionals to formulate a plan for evaluating C.M.[1] And in a meeting with C.M.'s parents and Dr. McGuffog on November 11, that group offered to use every procedure at its disposal to evaluate C.M.

After that meeting, Summit formulated a proposal that included five evaluations of C.M. in different areas. Summit proposed a speech-and-language evaluation, a physical therapy assessment, a social assessment, a psychological evaluation, and an occupational therapy functional assessment. Summit further proposed that each of those evaluations be conducted by an appropriately qualified person: a speech-language specialist, a physical therapist, a social worker, a psychologist, and an occupational therapist. C.M.'s parents consented to that plan.

---

[1] The group included a learning consultant, a psychologist, a social worker, a speech-language specialist, an occupational therapist, the principal, C.M.'s teacher, and two graduate-level psychology interns.

### E. Summit's Review of Its Initial Interventions

While the five evaluations were getting underway, the intervention team met on November 18 to review the previously implemented interventions. The team concluded that C.M. was making progress and that the interventions were working. The incentive to earn Pokémon cards daily had reduced C.M.'s outbursts to two for the entire month-and-a-half period. In addition to his behavioral growth, C.M. was making clear progress with his social skills. The intervention team also learned that C.M.'s teacher had, in line with Dr. McGuffog's recommendations, implemented some additional sensory interventions, such as Velcro under his desk, to help him sit still and pay attention. The team found that C.M. used those interventions and seemed to like them. C.M. also improved academically in fifteen areas, such as his reading level, his use of writing conventions, and his mathematical algebraic thinking.

Because C.M. had made meaningful progress and the interventions were successful, the intervention team decided to continue all of them. As far as making another assessment of C.M.'s progress, the team decided to hold another meeting after the five evaluations were completed.

### F. Summit's Determination, on February 8, 2016, that C.M. Was Ineligible for Special Education

By early February 2016, Summit had amassed an array of data on whether C.M. was eligible for special education. It had the materials provided by C.M.'s parents: the McGuffog Report, as well as supplemental reports from C.M.'s occupational therapist and psychologist. The occupational therapist determined that C.M. had delays in gross motor and fine motor skills and that he had difficulty in coordination and self-regulating. The psychologist, after observing C.M. in the classroom, reported that he was participating independently, and although his attention wandered, it was restored with

prompts. Overall, the psychologist found that C.M. was not disruptive and that he could answer his teacher's questions.

Summit also had the results of the five evaluations that it performed specifically to evaluate C.M. for special education.

The assessment of C.M.'s speech and language abilities involved two tests administered by a certified and licensed speech-language pathologist.[2] C.M. scored in the 50th and 17th percentile on those. But to be communication impaired, a child must score in the tenth percentile or below on two assessments – and C.M. was not in that range on either test.

The results of the physical therapy evaluation, performed by a physical therapist, reported areas of weakness. Those included decreased attention as well as proximal shoulder and hip joint weakness. But those issues did not affect C.M.'s gross motor function during his school-day routine.

The social assessment, performed by a licensed social worker, did not report any social concerns in the classroom. The assessment found that C.M. got along well with his peers, having made two friendships, and that he was very gentle, sweet, and kind to other students, except when he felt that he or someone else was the victim of an injustice (which was infrequent). The social worker also observed that C.M. would fidget and could get off task, but that was easily remedied with redirection.

The psychological evaluation, performed by the school psychologist, similarly determined that C.M. was generally focused and on task, but that he required occasional adult redirection. Like the social assessment, the psychological

---

[2] The two tests were the Comprehensive Assessment of Spoken Language ('CASL') and the Language Processing Test Elementary -3 ('LPT-3').

evaluation described C.M. as friendly, cooperative, and extremely polite. It also concluded that C.M. had a positive attitude toward school, his family, and his peers.

The final evaluation – an occupational therapy assessment performed by a registered occupational therapist – revealed that C.M.'s gross motor skills, fine motor skills, and bilateral motor skills were in the functional range. The occupational therapist further determined that C.M. could perform school-related tasks, but that for unfamiliar directions, he needed repetition and benefited from one-on-one guidance.

Summit also gathered data on C.M. from several other sources. Those included samples of C.M.'s work, paperwork from the intervention team, and comments from C.M.'s parents and Dr. McGuffog. In addition, Summit reviewed C.M.'s report card, on which his teacher remarked that he had developed "a greater understanding of the routines and expectations of first grade," had "made strides with organizational skills since the start of the year," and was "practicing patience and self-control." Pupil Progress Report (Grade 1) at 4 (JA1752).

To evaluate all of that data and assess C.M.'s eligibility for special education, Summit designated a group of fourteen staff members and other professionals from multiple disciplines.[3] After considering the compiled data and sharing it with C.M.'s parents, the group held a meeting on February 8, 2016, with

---

[3] The group consisted of the school psychologist, the school social worker, the school principal, the supervisor of special education, a learning disabilities teacher consultant, two physical therapists, two occupational therapists, C.M.'s general-education teacher, C.M.'s basic-skills teacher, an expert certified in speech-language pathology, and two graduate-level psychology interns.

C.M.'s parents, Dr. McGuffog, and C.M.'s special-education advocate.

That meeting ended with a determination that C.M. did not meet the eligibility requirements for special education and related services. All fourteen members of Summit's evaluation team agreed with that conclusion either because C.M. did not have a disability or because C.M did not need special education and related services. In support of that decision, Summit's team relied on the positive effects of the strategic behavioral interventions, which reduced the incidents of poor behavior. The group also recognized C.M.'s progress in reading and math as well as the behavioral improvements noted on his report card. Summit's staff understood that C.M. still had some weaknesses, but because he had positively responded to the interventions, they decided to continue to implement those in lieu of special education and related services.

C.M.'s parents, Dr. McGuffog, and C.M.'s special-education advocate disagreed with the conclusion that C.M. was ineligible for special education. Consistent with that belief, C.M.'s parents continued to have their son evaluated by Dr. McGuffog. They also retained a speech pathologist, Alana Fichtelberg, to conduct additional evaluations of C.M. Both of those professionals issued additional reports at the parents' request. In early 2017, Dr. McGuffog concluded that C.M. should be diagnosed with autism and ADHD.

After Summit received Dr. McGuffog's recommendation, it referred C.M. to a psychiatrist who diagnosed him with autism and ADHD. In April 2017, Summit determined that, based on the autism diagnosis, C.M. needed special education and related services, and it began developing an individualized education program (an 'IEP') for him. C.M.'s parents agreed to that IEP in August 2017, shortly before C.M. entered third grade.

In July 2019, C.M. left Summit to enroll in a private school.

11

## II. PROCEDURAL HISTORY AND JURISDICTIONAL ANALYSIS

While they continued to have C.M. evaluated, C.M.'s parents also formally challenged Summit's adverse eligibility decision from February 8, 2016. They did so by filing a due process complaint on May 25, 2016, with the Office of Special Education of New Jersey's Department of Education. *See* 20 U.S.C. § 1415(b)(7). That complaint alleged violations of the IDEA and § 504 of the Rehabilitation Act.

The due process complaint prompted an impartial due process hearing, *see* 20 U.S.C. § 1415(f)(1)(A), which took place over several dates between July 2017 and June 2018. Seven witnesses testified at the hearing. Both parties introduced documentary evidence that Summit's staff considered at the time of the eligibility determination. C.M.'s parents introduced the later-prepared reports from Dr. McGuffog and Fichtelberg, but the hearing officer did not consider them in reaching his determination because Summit "did not have this information available at the time of the initial determination." Hearing Officer Final Decision at 18 (Oct. 12, 2018) (JA50).

In October 2018 – about fourteen months after Summit had formalized an IEP for C.M. – the hearing officer issued a decision upholding Summit's determination that C.M. was not eligible for special education as of February 8, 2016. In reaching that conclusion, the hearing officer found that Summit's witnesses were "very credible," *id.* at 17 (JA49), but he discounted the testimony from C.M.'s mother and Dr. McGuffog. The problems with C.M.'s mother's testimony were that she was "combative and obstinate," she "seemed to not want to respond," and she "hesitated sometimes when answering simple questions." *Id.* The hearing officer also did not afford a great deal of weight to Dr. McGuffog's testimony on several grounds: she "appeared upset" that her recommendations were not implemented; she dismissed

12

C.M.'s report cards without proper justification; and, with respect to at least one issue, she did not convey "[a] fair reading of her first report." *Id.* at 18 (JA50). Substantively, after reviewing Summit's evaluations and considering C.M.'s positive responses to the interventions, the hearing officer concluded that Summit had satisfied its child-find obligations as of February 8, 2016.

In March 2020, about a year and a half after the hearing officer's dismissal of the due process complaint – and after C.M.'s parents had enrolled him in private school in July 2019 – C.M.'s parents initiated this civil action in the District Court. They claimed that Summit violated the IDEA and § 504 of the Rehabilitation Act, and they sought several forms of relief. Those included compensatory education for the time when C.M. was allegedly denied a FAPE (February 2016 through August 2017), an order requiring Summit to amend C.M.'s IEP to include services and interventions that Dr. McGuffog and Fichtelberg recommended after the February 2016 eligibility decision, and reimbursement for the costs of C.M.'s private-school education. By asserting those claims, the complaint fell within the District Court's subject matter jurisdiction. *See* 20 U.S.C. § 1415(i)(2)(A), (3)(A) (allowing parties aggrieved by the decision of a hearing officer after an IDEA due process hearing to file a civil action in federal district court); 28 U.S.C. § 1331; *Mengine v. Runyon*, 114 F.3d 415, 418 (3d Cir. 1997) (recognizing that 28 U.S.C. § 1331 grants district courts jurisdiction over Rehabilitation Act claims).

The parties cross-moved for summary judgment, and the District Court ruled in Summit's favor. It held that Summit satisfied its child-find obligation and did not violate § 504 of the Rehabilitation Act. The District Court also refused to enter a declaratory judgment that Summit was responsible for C.M.'s private-school tuition because that claim had not been exhausted administratively. Finally, the District Court rejected the parents' arguments that the hearing officer's credibility judgments were improper, that the McGuffog and Fichtelberg

13

*post hoc* reports should be considered, and that Summit had to amend its IEP.

The parents timely appealed the District Court's final order, bringing this case within this Court's appellate jurisdiction. *See* 28 U.S.C. § 1291.

### III. DISCUSSION

#### A. The Denial-of-FAPE Claim Based on a Breach of the Child-Find Duty

As Spending Clause legislation, the IDEA may impose conditions on school districts in return for their receipt of federal funding. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 295 (2006) ("Congress enacted the IDEA pursuant to the Spending Clause."); *see generally Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Consistent with that constitutional authority, the IDEA places two significant responsibilities on school districts with respect to children with disabilities: the child-find obligation and the duty to provide a free appropriate public education, commonly referred to as a 'FAPE,' to children with disabilities. *See D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 244 (3d Cir. 2012) ("[S]chools must: (1) identify children in need of special education services (Child Find); and (2) provide a FAPE to disabled students.").[4]

---

[4] *See also* 20 U.S.C. § 1401(3)(A) (defining "child with a disability" as having two elements: a qualifying disability and a need for special education and related services); N.J. Admin. Code § 6A:14-3.5(c) (conditioning eligibility for special education and related services on three requirements: (i) the child must have a qualifying disability; (ii) the child must have a need for special education and related services;

14

The child-find obligation requires school districts to "identif[y], locate[], and evaluate[]" all "children with disabilities . . . who are in need of special education and related services." 20 U.S.C. § 1412(a)(3)(A); *see also id.* § 1401(29) (defining "special education"), (26) (defining "related services"). A school district has a duty to evaluate a child for a disability upon "notice of behavior that is likely to indicate a disability." *D.K.*, 696 F.3d at 250 (quoting *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 271 (3d Cir. 2012)); *see also P.P. ex rel. Michael P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 738 (3d Cir. 2009) (explaining that the child-find duty requires school districts to evaluate "all students who are reasonably suspected of having a disability under the statute[]"). Once a school district has such a reasonable suspicion that a child has a disability, it has a reasonable time to evaluate "the specific problems a potentially disabled student is having." *D.K.*, 696 F.3d at 250; *see Ridley*, 680 F.3d at 271.

The IDEA also imposes specific requirements for evaluating a child who is reasonably suspected of having a disability. In conducting an evaluation, a school district must assess the child "in all areas of suspected disability," 20 U.S.C. § 1414(b)(3)(B), but that does not require the evaluation to be "designed to identify and diagnose every possible disability," *D.K.*, 696 F.3d at 250. *See P.P.*, 585 F.3d at 738–39 (finding no child-find violation where a school district failed to identify disabilities that were not reasonably suspected at the time). Also, a school district's assessment must seek to gain "relevant information" about the "educational needs of the child" to determine if the child needs special education and related services. 20 U.S.C. § 1414(b)(3)(C); *see also W.A. v. Hendrick Hudson Cent. Sch. Dist.*, 927 F.3d 126, 145 (2d Cir. 2019) (finding no child-find violation where "there was no reason to suspect that *special education* was needed to remedy [the child's] disability"). The IDEA further requires a school

and (iii) the child's disability must adversely affect his or her educational performance).

15

district's evaluation to be "administered by trained and knowledgeable personnel," 20 U.S.C. § 1414(b)(3)(A)(iv), who must use "a variety of assessment tools and strategies," *id.* § 1414(b)(2)(A), along with "technically sound instruments," *id.* § 1414(b)(2)(C). *See also id.* § 1414(c)(1)(A) (requiring school districts to review "data on the child" from several different sources). It is not enough for a school district to rely on a "single measure or assessment as the sole criterion," *id.* § 1414(b)(2)(B), or to use assessment methods in ways that are not "valid and reliable," *id.* § 1414(b)(3)(A)(iii). *See also id.* § 1414(b)(3)(A)(i) (prohibiting the use of evaluation materials that are "discriminatory on a racial or cultural basis"). If a school district meets these statutory requirements for identifying, locating, and evaluating a child with disabilities, then it discharges its child-find obligation.

After identifying a child with a disability who is also in need of special education and related services, a school district is obligated to provide a FAPE to the disabled child. *See* 20 U.S.C. § 1412(a)(1)(A); *see also id.* § 1401(3) (defining "child with a disability"). To do so, a school district, in coordination with the child's parents, should develop an IEP and provide special education and related services to the disabled child. *See Schaffer v. Weast*, 546 U.S. 49, 53 (2005) (explaining that "[t]he core of the [IDEA] . . . is the cooperative process that it establishes between parents and schools"); *see also* 20 U.S.C. § 1401(9) (defining "free appropriate public education"); *id.* § 1414(d) (defining "individualized education program"). Together, the child-find duty and the FAPE obligation require public schools to "identify and effectively educate" disabled children. *P.P.*, 585 F.3d at 735 (explaining further that if disabled children "require specialized services that the public institution cannot provide," then the school must "pay for their education elsewhere").

The IDEA creates a cause of action against a school district that fails to provide a FAPE to a child who has a disability and needs special education and related services. *See* 20 U.S.C.

§ 412(a)(1)(A); *id.* § 1415(f)(3)(E)(i)–(ii), (i)(2). Due to the relationship between the child-find obligation and the duty to provide a FAPE, a denial-of-FAPE claim may be premised on a child-find violation.[5] Such a claim has three elements. First, the child must have a disability for which he or she needs special education and related services. *See* 20 U.S.C. §§ 1412(a)(1)(A) (entitling all "children with disabilities" to a FAPE), 1401(3)(A) (defining "child with a disability" as a child with a qualifying disability and a need for special education and related services). Second, the school district must breach its child-find duty. *See* 20 U.S.C. § 1412(a)(3)(A); *P.P.*, 585 F.3d at 738; *Mr. P v. West Hartford Bd. of Educ.*, 885 F.3d 735, 750 (2d Cir. 2018). Third, the school district's child-find breach must impede the child's right to a FAPE, or, alternatively, the child-find breach must either "significantly impede[]" parental participation rights or "cause[] a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii)(I)–(III); *see D.K.*, 696 F.3d at 249 (characterizing a breach of the child-find duty as a procedural violation); *D.S.*, 602 F.3d at 565 (recognizing that "[a] procedural violation is actionable under the IDEA only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits").

To pursue a denial-of-FAPE claim premised on a breach of the child-find duty, parents must first file an administrative grievance, known as a 'due process complaint,' against the school district. *See* 20 U.S.C. § 1415(b)(6)(A); *see also id.* § 1415(b)(7)(A) (stating that a due process complaint must include the child's name and address, the name of the child's

---

[5] Another recognized category of denial-of-FAPE claims encompasses challenges to a school district's failure to provide a FAPE after a school district has determined that a child has a disability and is in need of special education and related services. *See, e.g.*, *Endrew F.*, 137 S. Ct. at 998–99; *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 556–57 (3d Cir. 2010).

17

school, a description of the problem, and a proposed resolution); *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 272 (3d Cir. 2014). A due process complaint may be resolved either through mediation, *see* 20 U.S.C. § 1415(e)(1), or by a hearing officer at a due process hearing, which is an impartial state- or local-level administrative adjudicatory process, *see id.* § 1415(f)(1)(A). *See generally* 2 Ronna Greff Schneider & Phyllis E. Brown, *Education Law: First Amendment, Due Process and Discrimination Litigation* § 6:9 (Oct. 2019 update); Charles J. Russo & Ralph D. Mawdsley, *Education Law* § 5.07 (2021). Absent the consent of the other party, only the grievances presented in the due process complaint may be raised by the party who requested the due process hearing. *See* 20 U.S.C. § 1415(f)(3)(B). After the due process hearing, the hearing officer makes findings and determinations to resolve the claim. *See id.* § 1415(f)(3)(E).

A party aggrieved by the hearing officer's decision may commence a civil action in federal district court and seek "such relief as the court determines is appropriate." *Id.* § 1415(i)(2)(C)(iii). But a civil action brought in federal court after a due process hearing can relate only to "the complaint presented" at the hearing. *Id.* § 1415(i)(2)(A); *see Batchelor*, 759 F.3d at 272 ("In the normal case, exhausting the IDEA's administrative process is required in order for the statute to grant subject matter jurisdiction to the district court." (citation, alteration, and internal quotation marks omitted)); *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 186 n.14 (3d Cir. 2009) ("[A] party seeking judicial relief from the decision of state administrative proceedings may do so only to the extent that the party sought such relief in those proceedings."). When it reviews a hearing officer's decision, a district court applies a unique "modified *de novo*" standard of review, under which it gives "due weight" to the hearing officer's determinations while it bases its own decision on the preponderance of the evidence. *Ridley*, 680 F.3d at 268; *see* 20 U.S.C. § 1415(i)(2)(C)(iii); *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003).

18

The civil action brought by C.M.'s parents contains two denial-of-FAPE claims, which were presented in their due process complaint. Both of those claims are premised on child-find violations. First, C.M.'s parents assert that Summit violated its child-find obligation by misconstruing the data indicating that C.M. had a specific learning disability. Second, they claim that Summit breached its child-find duty by not further evaluating whether C.M. had autism or ADHD. The success of both claims hinges on the second element of a child-find claim: a breach of the child-find duty.[6] As explained below, Summit did not breach its child-find obligation in either respect.

1. The Claim that Summit Breached Its Child-Find Obligation with Respect to Diagnosing a Specific Learning Disability

C.M.'s parents first contend that Summit violated its child-find duty by erroneously concluding that C.M. did not have a specific learning disability as of February 8, 2016. As defined by the IDEA (and similarly by New Jersey regulation), the term 'specific learning disability' generally means a psychological impairment in reading, written or oral expression, or math:

> [It is] a disorder in [one] or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in the

---

[6] There is no dispute that C.M. satisfies the other two elements of a child-find claim. For the first element, C.M. was eventually diagnosed with a disability – autism – for which he needed special education and related services. Under the third element, Summit did not determine that C.M. qualified for special education and related services until April 2017.

> imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations.

20 U.S.C. § 1401(30)(A); *see also* N.J. Admin. Code § 6A:14-3.5(c)(12).[7]   New Jersey allows school districts to use two methods to evaluate a specific learning disability: the severe-discrepancy approach and the response-to-intervention approach.  *See* N.J. Admin. Code § 6A:14-3.5(c)(12)(i), (ii). Under either method, New Jersey requires school districts to provide specific documentation of its assessment.  *See id.* § 6A:14-3.4(h)(4).

### a. The Severe-Discrepancy Approach to Identifying a Specific Learning Disability

The first method for identifying a specific learning disability is the severe-discrepancy approach.  Consistent with its name, that method examines whether there is a severe discrepancy "between the student's current achievement and intellectual ability in one or more [areas of academic aptitude]."   N.J. Admin. Code §  6A:14-3.5(c)(12)(i).   If a school district uses the severe-discrepancy approach, New Jersey requires it to "adopt procedures that utilize a statistical formula and criteria for determining severe discrepancy."  *Id.* § 6A:14–3.5(c)(12)(iv).  In line with that requirement, Summit has determined that a 22-point differential between a child's

---

[7] The IDEA further clarifies that the term 'specific learning disability' includes "perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia," and it excludes "a learning problem that is primarily the result of visual, hearing, or motor disabilities, of intellectual disabilities, of emotional disturbance, or of environmental, cultural, or economic disadvantage." 20 U.S.C.  § 1401(30)(B)–(C); *see also* N.J. Admin. Code § 6A:14-3.5(c)(12).

achievement and intellectual ability constitutes a severe discrepancy.

When he was tested in July and August 2015, C.M.'s measured achievement in three areas was below 90,[8] but his full-scale IQ was 113. Because C.M.'s scores in those three areas were over 22 points below his I.Q. score, he would qualify as having a specific learning disability in those three areas under the severe-discrepancy approach.

Critically, however, the IDEA contains a specific exception to the severe-discrepancy approach. Under that provision, a school district *may* use the severe-discrepancy method to find a specific learning disability, but it is not required to use that approach – or even *consider* the results of that approach for child-find purposes:

> [W]hen determining whether a child has a specific learning disability as defined in section 1401 of this title, a local educational agency shall not be required to *take into consideration* whether a child has a severe discrepancy between achievement and intellectual ability in oral expression, listening comprehension, written expression, basic reading skill, reading comprehension, mathematical calculation, or mathematical reasoning.

20 U.S.C. § 1414(b)(6)(A) (emphasis added).

Thus, although New Jersey regulations permit the severe-discrepancy method, a school district does not violate its child-find obligation by disregarding the results of the severe-discrepancy approach. Yet if a school district relies on that

---

[8] C.M. measured at 83 in listening comprehension, 89 in sentence composition, and 88 in pseudoword decoding.

approach, then a severe discrepancy establishes only that the child has a specific learning disability, and a separate inquiry is needed to ascertain whether the student needs special education and related services.

Here, Summit did not violate its child-find obligation by not considering the results of the severe-discrepancy approach. Summit could have relied on that approach to conclude that C.M. had specific learning disabilities in three areas where his aptitude scores were below 90. But Summit was not required to do so. *See* 20 U.S.C. § 1414(b)(6)(A). Nor did it violate its child-find duty by giving no consideration to the results of the severe-discrepancy approach in assessing C.M. for a specific learning disability. *See id.*

> b. *The Response-to-Intervention Approach to Identifying a Specific Learning Disability*

The second method allowed in New Jersey to evaluate a specific learning disability is the response-to-intervention approach. That method applies increasingly intensive and individualized instruction to a child and evaluates the child's progress in response to that intervention. *See* 20 U.S.C. § 1414(b)(6)(B); N.J. Admin. Code § 6A:14–3.5(c)(12)(ii); *see also Michael P. v. Dep't of Educ.*, 656 F.3d 1057, 1061–62 (9th Cir. 2011). If the child responds positively to the intervention, then he or she does not have a specific learning disability for which special education and related services are needed. But if the child responds negatively to the intervention or responds in a neutral way, then the child does have a specific learning disability and is in need of special education and related services. Thus, the response-to-intervention approach can function as a two-for-one: a negative or neutral response to intervention indicates that the child has a specific learning disability *and* is in need of special education and related services.

22

Through its intervention team, Summit started using the response-to-intervention approach a month into C.M.'s first-grade year. That team reviewed C.M.'s classroom behavior, and then it designed and implemented specific interventions to assist him. After implementing the first round of interventions for a month and a half, the team evaluated C.M.'s response and concluded that the interventions were working well.

As part of its evaluation of C.M.'s eligibility for special education and related services, a broader group of twelve members of Summit's staff reevaluated C.M.'s response to Summit's interventions about two and a half months after Summit's first evaluation. After that more comprehensive review, based on a larger data set, that group also determined that C.M. had benefited from the interventions and was making progress during his first five months of first grade.[9]

On this record, Summit did not violate its child-find duty by concluding that C.M. did not have a specific learning disability. Both the intervention team and the specially assembled evaluation group consisted of "trained and knowledgeable personnel." 20 U.S.C. § 1414(b)(3)(A)(iv). And they gained relevant information about C.M.'s educational needs through a recognized method – incremental,

_____

[9] C.M.'s parents argue that Summit improperly implemented the response-to-intervention method in violation of federal and New Jersey regulations. They cite 34 C.F.R. § 300.309(b)(2); *id*. § 300.311(a)(1), (7); and N.J. Admin. Code § 6A:14-3.4(h)(6)(i). But without an explanation as to how those alleged procedural violations affected the reliability of Summit's substantive findings, the parents' argument does not provide a basis for discrediting Summit's reliance on the response-to-intervention approach. *See D.S.*, 602 F.3d at 565–66 (declining to award relief to parents based on an alleged procedural violation where the school district "substantially satisfied" the IDEA's requirements).

potentially escalating interventions based on different tools and strategies. *See id.* § 1414(b)(3)(C), (b)(2)(A). Having met the relevant statutory requirements and having observed that C.M.'s classroom behavior and academic performance improved in response to interventions, Summit met its child-find obligations even though it concluded that, as of February 8, 2016, C.M. did not need special education and related services for a specific learning disability.

### 2. The Claim that Summit Breached Its Child-Find Obligation by not Evaluating C.M. Further for Autism and ADHD

C.M.'s parents and amici also assert that Summit violated its child-find obligation by not specifically evaluating C.M. for autism and ADHD by February 8, 2016.[10] Their challenge depends on whether Summit had "notice of behavior that is likely to indicate" one of those disabilities as of that date. *D.K.*, 696 F.3d at 250 (quoting *Ridley*, 680 F.3d at 271). For context on that notice issue, both parties recognize that behavioral issues and academic struggles are typical in early childhood, especially in the transition to first grade. And although C.M.'s parents had Dr. McGuffog administer a battery of sixteen tests to C.M. over the summer before he entered first grade, they did not alert Summit to C.M.'s behavioral issues before the school year. Thus, it was not until after C.M. started first grade that Summit had notice of his occasional outbursts, trouble maintaining attention, and, later, difficulty with writing. No one here contends that those behaviors by a six-year-old child transitioning to first grade sufficed to put Summit on notice that he may have autism or ADHD. *See D.K.*, 696 F.3d at 251

___

[10] The IDEA does not define autism or ADHD, which is an abbreviation for attention deficit hyperactivity disorder. But New Jersey regulations define 'autism,' *see* N.J. Admin. Code § 6A:14–3.5(c)(2), and the term 'other health impairment,' as defined in the regulation, encompasses ADHD, *see id.* § 6A:14–3.5(c)(9).

(explaining that, in early primary-school years, "hyperactivity, difficulty following instructions, and tantrums are not atypical" and that those behaviors alone do not necessarily raise a reasonable suspicion that the child has a disability). Rather, the dispute centers on Summit's child-find duty after C.M.'s parents shared the McGuffog Report – with its rule-out diagnoses for autism and ADHD.

Amici urge a new rule for rule-out diagnoses. They assert that under the child-find duty, a rule-out diagnosis triggers an obligation to assess a child specifically for the condition that cannot be ruled out. But no such bright-line rule exists under the IDEA. And this case demonstrates why. Dr. McGuffog declined to conclude that C.M. had autism or ADHD in large part due to his young age, and she noted that his academic struggles were very new. She also recognized that C.M. exhibited a "complex array of neurocognitive strengths and weaknesses," and posed a "diagnostic challenge, particularly given his young age." McGuffog Neuropsychological Evaluation Report at 36 (Oct. 8, 2015) (JA1720). Thus, by its own terms, the McGuffog Report concluded that it was too early to diagnose C.M. for autism or ADHD – one way or the other. In light of that conclusion and without additional behavior that indicated a likelihood of autism or ADHD, Summit did not violate its child-find duty by not immediately evaluating C.M. for those disabilities – especially since doing so would involve re-administering several of the same tests that Dr. McGuffog administered just months beforehand.[11]

---

[11] That is not to say that a rule-out diagnosis has no role in the child-find analysis: if the rule-out diagnosis is based on reliable evaluations and assessments, then, in combination with other circumstances, it may contribute to the likelihood that a child has a disability. But a rule-out diagnosis alone does not compel a school district to conduct additional specific evaluations,

Without advocating for a bright-line rule, C.M.'s parents argue that Summit violated the child-find duty by not evaluating C.M. specifically for autism and ADHD before classifying him as ineligible for special education and related services. But Summit made that eligibility decision only six months after Dr. McGuffog evaluated C.M. And without C.M. exhibiting appreciably more symptoms, Summit did not breach its child-find duty despite its conclusion that C.M. was still too young to be evaluated specifically for autism and ADHD.

C.M.'s parents' child-find argument comes undone more decisively due to Summit's active response to C.M.'s behavior. After C.M.'s parents requested special education, Summit began a multidisciplinary assessment of C.M. consisting of five separate evaluations, each conducted by a trained and knowledgeable professional. Although those tests revealed developmental weaknesses, none were significant, and they were offset by evidence of strength and progress. *See Ridley*, 680 F.3d at 272 ("[J]ust because a child has an area of weakness, it doesn't necessarily mean that she has a disability." (citation and alteration omitted)).

In addition to those five multidisciplinary evaluations, Summit intervened to address C.M.'s behavioral issues. With those interventions – which began during C.M.'s first month of school, before Dr. McGuffog completed her report or proposed any interventions – his social skills started to improve, and his incidents of misbehavior became infrequent.

Similarly, Summit intervened in response to C.M.'s emerging academic difficulties. It provided him extra reading lessons four days a week and enrolled him in an after-school 'basic skills' program that met twice a week to reinforce his reading and math skills. Afterwards, C.M. demonstrated

---

much less to re-administer the same tests that led to the rule-out diagnosis.

measurable improvement in fifteen areas of academic performance.

Based on the additional five multidisciplinary evaluations and the progress that C.M. was making *without special education* in both areas of concern (his problematic behaviors and his emerging academic struggles), Summit did not breach its child-find obligations by concluding that C.M. did not need special education as of February 8, 2016. *See D.K.*, 696 F.3d at 252 (upholding a finding that no child-find violation occurred where the school district's faculty "did not neglect [the child's] difficulties" but rather "took proactive steps to afford him extra assistance and worked closely with his parents to maximize his potential for improvement"); *Ridley*, 680 F.3d at 272 (holding that no child-find violation occurred where the school district "appeared to be invested in addressing [the child's] needs and provid[ed] appropriate instruction and interventions before rushing to special education identification").

3. The Parent's Remaining Arguments Against the District Court's Rejection of Their IDEA Claim Do Not Succeed.

    a. *The District Court Did Not Improperly Exclude Evidence of Facts that Arose After Summit Initially Denied Eligibility.*

C.M.'s parents argue that the District Court improperly excluded evidence of facts that arose after February 8, 2016, the date that Summit determined that C.M. was ineligible for special education and related services. Specifically, C.M.'s parents sought to introduce a total of five reports that were written after that adverse eligibility determination: three reports from Dr. McGuffog that related to her multiple evaluations of C.M. between July 2016 and February 2017, and two reports from Alana Fichtelberg (the speech pathologist)

27

relating to evaluations of C.M. in July 2016 and February 2017. The purpose for introducing those reports was to prove "that Summit's ineligibility determination was manifestly unreasonable." Appellants' Br. 43. The District Court did not abuse its discretion in declining to supplement the record with those reports.

In challenging the outcome of a due process hearing in a federal district court, a party may seek to supplement the record with additional evidence. *See* 20 U.S.C. § 1415 (i)(2)(C)(ii). But a district court has discretion to exclude evidence that is irrelevant, cumulative, or otherwise unhelpful. *See D.K.*, 696 F.3d at 253 ("[T]he court need not consider evidence that is irrelevant or cumulative . . . ." (citation omitted)); *see also Susan N.*, 70 F.3d at 760 ("While a district court appropriately may exclude [*post hoc*] evidence, a court must exercise particularized discretion in its rulings so that it will consider evidence relevant, non-cumulative and useful in determining whether Congress' goal has been reached for the child involved.").[12]

Under the relevance standard, a district court may exclude *post hoc* evidence offered to prove a breach of a school district's child-find obligation. The IDEA specifies that a school district's child-find duty requires a review of "*existing* evaluation data on the child." 20 U.S.C. § 1414(c)(1)(A) (emphasis added); *see also* N.J. Admin. Code § 6A:14-3.5(c) (requiring eligibility determinations to "be based on all

---

[12] *See also* Maggie Wittlin, *Hindsight Evidence*, 116 Colum. L. Rev. 1323, 1389 (2016) (explaining that "the Third Circuit . . . considers hindsight evidence only to the extent that it is relevant" to IDEA issues); Note, Dennis Fan, *No IDEA What the Future Holds: The Retrospective Evidence Dilemma*, 114 Colum. L. Rev. 1503, 1540 (2014) (explaining that the "rule allowing retrospective evidence as articulated by the Third Circuit . . . is best stated as a relevance rule").

assessments *conducted*" up to the point of decision (emphasis added)).  Thus, the child-find duty is based on the "snapshot of the student's condition at the time of the" school district's child-find determinations.  *Lisa M. v. Leander Indep. Sch. Dist.*, 924 F.3d 205, 215 (5th Cir. 2019); *see also L.J. v. Pittsburg Unified Sch. Dist.*, 850 F.3d 996, 1004 (9th Cir. 2017).  And evidence of a child's behaviors or test results outside of that snapshot – such as reports that did not exist when a school district decided not to evaluate a child or when a school district denied eligibility – are not relevant to whether the school district breached its child-find obligations.

But not all facts arising after an adverse eligibility decision are irrelevant.  Later-occurring facts may be relevant to other elements of a denial-of-FAPE claim premised on a breach of the child-find duty.  For example, such facts may be relevant to whether the child had a disability.  Similarly, evidence of later-occurring facts may be relevant to determining how long or to what degree a school district denied a FAPE to a disabled child.

Here, the five later-in-time reports were not proffered to prove that C.M. was disabled or to establish the amount of time that Summit did not provide special education and related services.  Instead, those reports of C.M.'s performance on subsequent tests sought to show that the school district breached its child-find obligation.  Yet, as explained above, the reports are irrelevant to that issue.  Accordingly, the District Court did not abuse its discretion in excluding the five reports from the record after "considering" them and finding that they are not "relevant."  *J.M. v. Summit City Bd. of Educ.*, 2020 WL 6281719, at *7 (D.N.J. Oct. 27, 2020).[13]

_____

[13] Our dissenting colleague fears that preventing the use of *post hoc* evidence to prove a breach of the child-find duty "encourages schools to conduct cursory evaluations in the first instance."  Dissent at 7–8.  He would extend precedent from

*b. The District Court Did Not Err in Crediting the Hearing Officer's Adverse Credibility Determinations.*

C.M.'s parents also contend that the District Court erred by deferring to the hearing officer's negative credibility determination with respect to Dr. McGuffog's testimony at the due process hearing.

As a general principle, a reviewing court deferentially reviews a fact-finder's assessment of a witness's credibility. *See Cooper v. Harris*, 137 S. Ct. 1455, 1474 (2017) (explaining that appellate courts "give singular deference to a trial court's judgments about the credibility of witnesses" because "the various cues that 'bear so heavily on the listener's understanding of and belief in what is said' are lost on an appellate court later sifting through a paper record" (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985))). And in the IDEA context, when a federal court reviews a hearing officer's credibility determination, it must credit that assessment "unless the nontestimonial, extrinsic evidence in the record would justify a contrary conclusion." *D.K.*,

_____

other areas of IDEA jurisprudence to the child-find context. But the IDEA precludes that approach in the child-find context because the child-find obligation requires school districts to review "*existing* evaluation data on the child." 20 U.S.C. § 1414(c)(1)(A) (emphasis added). And the irrelevance of *post hoc* evidence in assessing a child-find breach does not legitimatize cursory evaluations. To the contrary, this Circuit's jurisprudence already recognizes that if a school district conducts "a poorly designed and ineffective round of testing" or fails to evaluate a child when "school officials are on notice of behavior that is likely to indicate a disability," then the school district breaches its child-find obligation. *D.K.*, 696 F.3d at 250; *see also* 20 U.S.C. § 1414(b)(3)(B) (requiring school districts to evaluate "in all areas of suspected disability").

696 F.3d at 243 (quoting *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004)); *see also Ridley*, 680 F.3d at 273 n.7.

Here, C.M.'s parents identify no nontestimonial, extrinsic evidence that contradicts the hearing officer's adverse credibility determinations. Without a valid basis to diverge from the hearing officer's negative credibility assessments, the District Court did not err.

### c. The District Court Did Not Err by Rejecting the Claim for Declaratory Judgment.

C.M.'s parents further contend that the District Court erred by not entering a declaratory judgment related to two events that took place after they filed their due process complaint. Specifically, C.M.'s parents seek a judgment declaring that Summit should have implemented additional interventions in its later-developed IEP for C.M. and that Summit owes them the costs of private-school tuition. Since those events had not occurred when C.M.'s parents filed their due process complaint, they were not raised in the due process complaint. Yet without the consent of the opposing party, which Summit did not provide, a due process complaint limits the scope of the issues that may be raised at the due process hearing and later reviewed in court. *See* 20 U.S.C. § 1415(f)(3)(B) (preventing the party who requests the due process hearing from raising "issues at the due process hearing that were not raised in the [due process complaint]" without the other party's consent); *id.* § 1415(i)(2)(A) (providing that a party aggrieved by the hearing officer's findings and decision may bring a civil action "with respect to the [due process] complaint presented"). C.M.'s parents could have sought to amend their due process complaint once those events occurred. *See* 20 U.S.C. § 1415(c)(2)(E) (describing options for amendment); N.J. Admin. Code § 6A:14-2.7(i) (same). Or they could have challenged those events through a separate, later-in-time due

31

process complaint. But they did neither. Without doing so, they are not entitled to a declaratory judgment on either issue, and the District Court did not err in rejecting their request for such relief.

## B. The District Court Did Not Err in Rejecting the Claim Under § 504 of the Rehabilitation Act.

C.M.'s parents also appeal the District Court's rejection of their claim under § 504 of the Rehabilitation Act. *See* 29 U.S.C. § 794. They have not presented any evidence unique to that claim either at the administrative level or in the District Court. Rather, they assert a § 504 cause of action purely as a companion to their denial-of-FAPE claim. Due to the similarities between the two statutes, it is possible for the same underlying facts to establish liability for a denial-of-FAPE claim under the IDEA and a violation of § 504 of the Rehabilitation Act.

The IDEA and § 504 have several common characteristics. Both statutes apply to public schools that receive federal financial assistance. *See* 20 U.S.C. §§ 1412, 1413; 29 U.S.C. § 794(b)(2)(B). And both protect persons with disabilities. *See Endrew F.*, 137 S. Ct. at 993 (stating that "[a] State covered by the IDEA must provide a disabled child with . . . special education and related services"); *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 253 (3d Cir. 1999) (explaining that § 504 "prohibits discrimination on the basis of disability in federally funded programs"). Moreover, this Circuit allows relief under both causes of action as long as the § 504 claim is presented in the due process complaint consistent with the IDEA's exhaustion requirement. *See* 20 U.S.C. § 1415(*l*); *Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125, 131–34 (3d Cir. 2017).

The two statutes also differ in important respects. They define the term 'disability' differently. Under the Rehabilitation Act, the child's disability must limit a major life

32

activity, but the IDEA does not have that requirement. *Compare* 29 U.S.C. § 794(a) (incorporating the definition of "disability" from the Americans with Disabilities Act), *with* 20 U.S.C. § 1401(3); *see also Batchelor*, 759 F.3d at 269 n.4 ("Section 504 defines disability more broadly than the IDEA, and thus, some students covered by Section 504 are not covered under the IDEA."); *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 159 (2d Cir. 2016) (explaining that, by defining 'disability' differently, the IDEA and § 504 impose "distinct legal standards" and "provide for different inquiries"). The statutes also impose different duties to protect persons with disabilities. Central to the IDEA's protection of children with disabilities are the affirmative child-find and FAPE duties, *see* 20 U.S.C. § 1412(a)(1)(A), (a)(3)(A), but § 504 protects persons with disabilities by making it illegal for a federally funded program to discriminate against a disabled person solely by reason of his or her disability, *see* 29 U.S.C. § 794(a). *See generally Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 756 (2017) ("[T]he IDEA guarantees individually tailored educational services, while Title II and § 504 promise non-discriminatory access to public institutions."); *Matula*, 67 F.3d at 492 ("While [the] IDEA is phrased in terms of a state's affirmative duty to provide a free, appropriate public education, the Rehabilitation Act is worded as a negative prohibition against disability discrimination in federally funded programs."). The IDEA also identifies several specific components of the affirmative duties that it imposes, *see, e.g.*, 20 U.S.C. § 1412(a)(3)(A) (describing the child-find duty); *id.* § 1412(a)(1)(A) (requiring a participating state to provide a FAPE to disabled children); *id.* § 1414 (listing evaluation procedures and requirements), while § 504 requires a showing that disability discrimination was the sole cause of a denial of a benefit, *see* U.S.C. § 794(a). Also, the statutes differ in the relief that plaintiffs can obtain, most notably with § 504 allowing plaintiffs to recover compensatory damages when they can show that the "discrimination was intentional." *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 269 (3d Cir. 2014) (explaining further that a showing of "negligence or

33

bureaucratic inaction" does not suffice for intentional conduct (quoting *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013))); *cf. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 186 (3d Cir. 2009) (holding that "compensatory and punitive damages are not an available remedy under the IDEA").

Depending on the factual basis for a denial-of-FAPE claim, the legal differences between the IDEA and § 504 may be of no moment. A child could meet both definitions of disability, bring a claim that falls into the overlapping space between the IDEA's affirmative duty and § 504's negative duty, and show that disability discrimination was the sole cause for the denial of a FAPE. In those circumstances, liability for a denial-of-FAPE will also result in liability under § 504. *See P.P.*, 585 F.3d at 735–36; *Ridgewood Bd. of Educ.*, 172 F.3d at 253; *Andrew M. v. Del. Cnty. Off. of Mental Health & Mental Retardation*, 490 F.3d 337, 349 (3d Cir. 2007). But a denial of a FAPE is not a *per se* violation of § 504. *See Andrew M.*, 490 F.3d at 349.

For this case, it is not necessary to analyze whether the § 504 claim may be brought as a companion to the denial-of-FAPE claim. That is so because C.M.'s parents do not succeed on their denial-of-FAPE claim, and they offer no additional evidence in support of their § 504 claim. Thus, even if the facts of this case rendered the legal differences between the two statutes immaterial, the failure of the denial-of-FAPE claim would still foreclose the § 504 claim. Accordingly, the District Court did not err in rejecting C.M.'s parents' claim under § 504 of the Rehabilitation Act.

\* \* \*

For the foregoing reasons, we will affirm the judgment of the District Court.

GREENAWAY, JR., *Circuit Judge*, dissenting.

The purpose of the Individuals with Disabilities Education Act ("IDEA") is to provide equality of educational opportunity for children with special challenges. Information regarding a child's capabilities is key to determining whether that child qualifies as disabled and what constitutes an appropriate educational plan. When experts provide information that can facilitate the provision of an appropriate educational plan, the school decisionmakers should be armed with it so they can make an informed judgment. This is especially true where expert reports are post-hoc—meaning created after the initial eligibility determination—because they are prepared when a child's challenges persist and may be more comprehensive as well as the product of more time and money relative to the information upon which the initial eligibility determination was based.

I believe that the District Court erred in excluding five reports that were prepared in connection with evaluations of C.M. that took place after Summit's February 8, 2016 adverse eligibility determination. Those reports could have been relevant in determining whether the school district satisfied its duty to provide C.M. with a free appropriate public education ("FAPE"). We should accordingly vacate and remand the cause to the District Court so that it can apply the appropriate standard in considering whether to rely on this post-hoc evidence. I therefore dissent.

When Congress enacted the IDEA, its purpose was to ensure that states receiving federal education funding provided students a FAPE. 20 U.S.C. § 1414(d)(1)(A). The FAPE mandate applies with equal force to children with disabilities. Pursuant to their child-find obligation, school districts must

1

"identif[y], locate[], and evaluate[]" children with disabilities, 20 U.S.C. § 1412(a)(3)(A), and assess them "in all areas of suspected disability," § 1414(b)(3)(B). Schools satisfy their duty to provide a FAPE to children with disabilities by developing an Individualized Education Plan ("IEP"). 20 U.S.C. § 1414(d). The IDEA's purpose can be realized only if schools vigilantly seek to identify signs of disability—whether they be behavioral or academic—and tailor a child's education accordingly to facilitate educational progress.

In holding that courts can essentially summarily exclude post-hoc evidence bearing on whether a school district breached its child-find obligation, I fear that we may have created a loophole that undermines the IDEA's purpose and insulates school districts from liability under the IDEA.

I begin my analysis with the text of the IDEA itself. The IDEA provides that "[a]ny party aggrieved by the [administrative] findings and decision" has the right to bring a civil action during which the court "shall hear additional evidence at the request of a party." 20 U.S.C. § 1415(i)(2)(C)(ii). Although we have limited our review to then-existing evidence in some scenarios, we have also interpreted "additional evidence" to include post-hoc evidence in others.

For instance, we have considered post-hoc evidence in evaluating the reasonableness of an IEP. In *Fuhrmann ex rel. Fuhrmann v. E. Hanover Sch. Dist. Bd. of Educ.*, we held that "evidence of a student's later educational progress may be considered only in determining whether the original IEP was reasonably calculated to afford some educational benefit" when offered. 993 F.2d 1031, 1040 (3d Cir. 1992). For other inquiries relating to an IEP, the snapshot rule, which bars post-

2

hoc evidence, applies. Under that rule, "the measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date." *Id.*

In *Susan N. v. Wilson Sch. Dist.*, we extended *Fuhrmann* beyond the IEP context to the broader IDEA eligibility context. In that case, we held that the district court erred in summarily excluding additional evidence that was not available when a school district determined that a child was ineligible for special education. 70 F.3d 751, 755, 759-62 (3d Cir. 1995). Extending *Fuhrmann*, we held that "after-acquired evidence . . . should be used by courts only in assessing the reasonableness of the district's initial decisions regarding a particular IEP *or the provision of special education services at all*." *Id.* at 762 (emphasis added).

Of note, *Susan N.* requires courts to consider the post-hoc evidence—it does not require courts to incorporate that evidence into its findings. Specifically, it provides:

> While a district court appropriately may exclude additional evidence, a court must exercise particularized discretion in its rulings so that it will consider evidence relevant, non-cumulative and useful in determining whether Congress' goal has been reached for the child involved. Consequently, on the remand the district court should use this standard in determining whether to admit the proffered additional evidence, *i.e.*, would the evidence assist the court in ascertaining whether Congress' goal has been and is being reached for the child involved.

3

*Id.* at 760.[1]   While courts are required to consider post-hoc evidence, they must also heed *Susan N.*'s warning to review that evidence "carefully" given the "dangers inherent in . . . second-guessing the decisions of a school district with information to which it could not possibly have had access at the time it made those decisions."  *Id.* at 762.

My colleagues in the majority assert that the snapshot rule applies to child-find obligations, citing *Lisa M. v. Leander Indep. Sch. Dist.*, 924 F.3d 205, 215 (5th Cir. 2019) and *L.J. v. Pittsburg Unified Sch. Dist.*, 850 F.3d 996, 1004 (9th Cir. 2017).  According to the majority, it follows that "evidence of a child's behaviors or test results outside of that snapshot . . . are not relevant to whether the school district breached its child-find obligations."  Majority Op. 35.  This means that a court can exercise its discretion to exclude the post-hoc evidence offered to prove breach because it is irrelevant.  *See D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 253 (3d Cir. 2012)

---

[1] We have also applied the *Susan N.* inquiry outside of the IEP context.  In *D.K. v. Abington Sch. Dist.*, we declined to summarily exclude post-hoc evidence—namely, an expert report opining on the appropriateness of a school district's response to a child's behavioral incidents—offered to support a claim that the school district failed to provide a child with a FAPE before it designed an IEP for that child.  696 F.3d 233, 243 (3d Cir. 2012).  Although we ultimately excluded the evidence because it was duplicative, our rejection of the snapshot rule shows that *Susan N.* applies beyond the IEP context and to the broader IDEA context.  *See id.* at 253.  Accordingly, applying *Susan N.* to the propriety of an eligibility determination is not an unprincipled extension of our precedent.

("[T]he court need not consider evidence that is irrelevant . . . ." (citation omitted)). By declaring that post-hoc evidence is irrelevant to the issue of a school district's child-find breach under the snapshot rule, the majority essentially gives courts carte blanche to summarily reject that evidence.

Initially, we are not bound by *Lisa M.* or *L.J.*, both of which are out-of-circuit decisions. We are, however, bound by *Fuhrmann* as well as *Susan N.'s* extension of *Fuhrmann* to the broader IDEA eligibility context. If the majority had applied *Susan N.*, it would be hard pressed to explain why post-hoc reports prepared in connection with evaluations of a child and providing disability diagnoses are irrelevant to whether a school district breached its child-find obligation—namely, its duty to "identif[y], locate[], and evaluate[]" children with disabilities, 20 U.S.C. § 1412(a)(3)(A), and to provide them with a FAPE, 20 U.S.C. § 1414(d).

That the majority would allow consideration of post-hoc evidence with regard to other elements of a denial-of-FAPE claim—such as whether the child has a disability or determining the extent to which a school district denied a FAPE—is of no moment. The evidence existing at the time of the eligibility determination may be cursory or under-developed, rendering families unable to demonstrate the school district's breach. Because breach is a required element of a denial-of-FAPE claim, the inability to use post-hoc evidence to show breach could prove fatal to the entire claim.[2]

---

[2] As the majority explained, there are three required elements of a denial-of-FAPE claim. First, the child must have a disability for which he or she needs special education and related services. *See* 20 U.S.C. §§ 1412(a)(1)(A). Second, the

5

Here, both the District Court and Administrative Law Judge ("ALJ") rejected the post-hoc evidence, and our review of that legal conclusion is de novo. *T.R. v. Kingwood Twp. Bd. of Ed.*, 205 F.3d 572, 576 (3d Cir. 2000). The ALJ upheld Summit's eligibility determination based on the snapshot rule, citing *Fuhrmann*. The ALJ reasoned that because Summit "used all information available to it at the time of the eligibility meeting on February 8, 2016," it satisfied that rule. J.A. 56. Likewise, the District Court applied the snapshot rule, reasoning that eligibility "is a snapshot of the student's condition at the time of the eligibility determination." J.A. 16 (quoting *Lisa M.*, 924 F.3d at 215 (internal footnote omitted)). Given that a student's condition as of the eligibility determination is all that matters under the snapshot rule, the District Court concluded that the post-hoc reports were not "relevant to the ALJ's decision." J.A. 15-16. Further, the District Court declined to rely on *Susan N.*, noting that *Susan N.*'s holding is limited to the reasonableness of an IEP. [3]

school district must breach its child-find duty in a manner that impedes the child's right to a FAPE. *See D.K.*, 696 F.3d at 250. Third, the school district's child-find violation must deprive the disabled child of needed special education and related services, thereby denying the child a FAPE. *See* 20 U.S.C. § 1415(f)(3)(E)(i)-(ii).

[3] The District Court cited *D.S. v. Bayonne Bd. of Educ.* for this proposition. However, that case involved the appropriateness of an IEP, so we had no occasion to discuss the type of evidence that could be used to determine the accuracy of an IDEA eligibility determination. *See* 602 F.3d 553, 555-56 (3d Cir. 2010). The District Court also cited *Lisa M. v. Leander Indep. Sch. Dist.*, which limits the review of an eligibility determination to information available at the time of evaluation

According to the District Court, there is "good reason not to extend *Susan N.* here: unlike the eligibility determination, the reasonableness of an IEP is measured by "staff implementation and student performance over a period of time."  J.A. 16 (quoting *Lisa M.*, 924 F.3d at 215 (internal footnote omitted)).

In excluding the post-hoc evidence, the District Court analyzed the relevance of the post-hoc reports under the wrong standard.  As a threshold matter, *Susan N.* applies because the IDEA eligibility determination constitutes "the provision of special education services at all."  *See* 70 F.3d at 762.  What else could "at all" refer to or mean if not the eligibility determination itself?  "[T]he provision of special education services at all" *hinges on* the eligibility determination.  If a school district finds a child ineligible for special education, the inquiry ends—the school will not provide special education services.  If, however, the school district finds the child eligible, it will provide special education services.  Accordingly, the District Court should have analyzed whether the post-hoc reports are "relevant, non-cumulative and useful" in determining whether Congress' goal—to ensure that Summit provided C.M. with a FAPE—was being met.  *See id.* Untethered to the snapshot rule, it does not necessarily follow that the post-hoc reports would be irrelevant.  The District Court would have the discretion to exclude the reports, but only after making appropriate inquiry.  Its failure to meaningfully consider the post-hoc evidence based on the snapshot rule constitutes error.

because "[s]ubsequent events do not determine ex ante reasonableness in the eligibility context."  924 F.3d 205, 214-15 (5th Cir. 2019).  That case is not binding.

The majority's departure from our own precedent leaves children with disabilities in a vulnerable position and jeopardizes their educational progress. It also gives school districts perverse incentives. Specifically, it encourages schools to conduct cursory evaluations in the first instance without concern for liability based on more thorough expert evaluations that diagnose students with disabilities and occur after the child has been found ineligible for special education.

For instance, envision a school district that is confronted with a young child exhibiting a persistent inability to pay attention during class. On one hand, that behavior could be construed as normal behavior for a child of that age. On the other, that behavior could signal a disability. Knowing that its special eligibility determination for that child will be measured against only the information available at the time of the decision, the school district may be inclined to perform a perfunctory examination of the child in order to save time and resources. After all, the school district can ostensibly attribute those attention deficit issues to the child's preference for socializing over addition and subtraction—a preference likely shared by many of his or her classmates. Then, months later, if a third-party were to conduct a comprehensive evaluation and diagnose that child with a disability, that child's family would be unable to use the diagnosis as evidence that the school district breached its duty to provide a FAPE. According to the majority, that evidence would be irrelevant. The school district would be insulated from liability, and the child will have sustained years of an inadequate education with no recourse.

The District Court should have considered whether the post-hoc reports diagnosing C.M. with disabilities would assist in determining whether Summit had provided a FAPE to C.M.

as opposed to rejecting them as irrelevant under the snapshot rule.  I respectfully dissent.